RECORD NUMBER: 15-2522

# United States Court of Appeals

*for the*

# Fourth Circuit

**ABIGAIL WILSON,**

*Plaintiff/Appellant,*

– v. –

**GASTON COUNTY, NC,**

*Defendant/Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT CHARLOTTE

# OPENING BRIEF OF APPELLANT

**SEAN F. HERRMANN**
**JOSHUA R. VAN KAMPEN**
**VAN KAMPEN LAW, PC**
**225 E. Worthington Avenue**
**Charlotte, NC 28203**
**(704) 247-3245**

*Counsel for Appellant*

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case.  Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.  Counsel has a continuing duty to update this information.

No. 15-2522            Caption: _____ Abigail Wilson v. Gaston County, NC _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____ Abigail Wilson _____ who is _____ Appellant _____ ,
   (name of party/amicus)            (appellant/appellee/amicus)

makes the following disclosure:

1.    Is party/amicus a publicly held corporation or other publicly held entity?
         ☐ YES         ☑ NO
2.    Does party/amicus have any parent corporations?
         ☐ YES         ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?
         ☐ YES         ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?
         ☐ YES         ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)
         ☐ YES         ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?
         ☐ YES         ☑ NO
      If yes, identify any trustee and the members of any creditors' committee:

_____ s/ Sean F. Herrmann _____                    _____ 03/03/2016 _____
         (signature)                                                (date)

# TABLE OF CONTENTS

Table of Authorities ................................................................. iv

Statement of Subject Matter and Appellate Jurisdiction ......................................... 1

Statement of the Issues............................................................... 2

Statement of the Case................................................................ 2

    Statement Of Facts ............................................................. 3

   I. Ms. Wilson Begins Working for the County and Suffers a Serious Health Scare ........................................................... 3

   II. Ms. Wilson Returns to a Hostile Environment............................................ 5

   III. The Hostile Environment Evolves and Sexual Harassment Enters the Picture ................................................................ 6

     A. The County Hires Putman ........................................................ 6

     B. Putman Inappropriately Touches a Co-Worker ........................................ 6

     C. Ms. Spurrier Informs the County That She Had to Punch Putman to Avoid an Unwanted Kiss........................................... 8

     D. Putman Begins Harassing Ms. Wilson ...................................... 9

     E. Ms. Wilson Repeatedly Reports the Abuse to Management in Accordance With the County's Policy .................................... 12

     F. Ms. Wilson's Supervisors Witness Putman's Harassment .................... 14

     G. Human Resources Investigates and Substantiates Ms. Wilson's Allegations.......................................... 14

       1. Parker Becomes Involved, Which Triggers HR Action.................... 14

       2. HR's Investigation Confirms Putman's Harassment......................... 15

i

H. "Stage Two" Harassment ........................................................ 18

Summary of Argument ................................................................ 19

Argument........................................................................................ 20

I. Standard of Review............................................................... 20

II. Ms. Wilson Forecasts Hostile Work Environment Evidence Sufficient to Meet the Legal Standard............................................................... 21

    A. The District Court Misapplied Law........................................... 22

    B. The District Court Improperly Construed Evidence in Favor of the Moving Party and Omitted Salient Facts ................................. 29

        1. "Stage Two" Harassment Not Considered or, at Best, Not Properly Weighed.................................................................. 29

        2. The District Court Disregarded Ms. Wilson's Signed Declaration Even Though the District Court Gave Significant Weight to a Declaration Submitted by the County's Witness ........... 30

        3. The District Court Construed Other Evidence Relevant to Imputation in Favor of Movant and Made Additional Credibility Determinations................................................. 32

III. The District Court Improperly Evaluated Plaintiff's FMLA and ADA Retaliation Claims ........................................................................ 35

IV. Ms. Wilson North Carolina Tort Claims Should be Decided by a Jury...... 37

    A. The Evidence Shows That a Jury Could Conclude That the County Negligently Retained and Supervised Putman ........................ 37

    B. Ms. Wilson's Battery Claim Against the County Should Go to a Jury .............................................................................................. 40

ii

C. The District Court's Decision to Grant Summary Judgment on Plaintiff's IIED Claim is Similarly Flawed ............................................. 43

Conclusion ........................................................................................... 44

Request for Oral Argument ................................................................... 44

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ............................ 20

*Barrett v. Applied Radiant Energy Corp.*,
    240 F.3d 262 (4th Cir. 2001) ...................................................................... 26

*Bergbauer v. Mabus*,
    934 F. Supp. 2d 55 (D.D.C. 2013)............................................................... 36

*Boyer-Liberto v. Fontainebleau Corp.*,
    786 F.3d 264 (4th Cir. 2015) ...................................................................... 23

*Brown v. Burlington Indus., Inc.*,
    93 N.C.App. 431 (1989) .................................................................. 41, 43, 44

*Bryant v. Thalhimer Bros., Inc.*,
    113 N.C. App. 1 (1993) ............................................................................... 41

*Burlington N. & Santa Fe Ry. Co. v. White*,
    548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) ............................ 36

*Carson v. Giant Food, Inc.*,
    187 F. Supp. 2d 462 (D. Md. 2002)............................................................. 23

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ............................ 21

*Cline v. Wal–Mart Stores, Inc.*,
    144 F.3d 294 (4th Cir.1998) ....................................................................... 35

*Davis v. City of Charlottesville Sch. Bd.*,
    498 F. App'x 231 (4th Cir. 2012) ................................................................ 25

*Davis v. United States Postal Serv.*,
    142 F.3d 1334 (10th Cir. 1998) .................................................................. 27

iv

*Denning-Boyles v. WCES, Inc.*,
    123 N.C. App. 409 (1996) ................................................................ 42

*Dickens v. Puryear*,
    276 S.E.2d 325 (N.C. 1981) ........................................................... 43

*Dickens v. Puryear*,
    302 N.C. 437 (1981) ...................................................................... 40

*Distasio v. Perkin Elmer Corp.*,
    157 F.3d 55 (2d Cir. 1998) ............................................................ 28

*Dulaney v. Packaging Corp. of Am.*,
    673 F.3d 323 (4th Cir. 2012) ......................................................... 23

*E.E.O.C. v. Fed. Express Corp.*,
    188 F. Supp. 2d 600 (E.D.N.C. 2000) ........................................... 23

*EEOC v. Cent. Wholesalers, Inc.*,
    573 F.3d 167 (4th Cir.2009) .......................................................... 22

*Estes v. Comstock Homebuilding Companies, Inc.*,
    195 N.C. App. 536 (2009) ............................................................. 41

*Ferris v. Delta Air Lines, Inc.*,
    277 F.3d 128 (2d Cir. 2001) .................................................... 27, 28

*Freeman v. Dal-Tile Corp.*,
    750 F.3d 413 (4th Cir. 2014) .................................................. passim

*Guinup v. Petr-All Petroleum Corp.*,
    786 F. Supp. 2d 501 (N.D.N.Y. 2011) ........................................... 36

*Hawkins v. Hawkins*,
    101 N.C. App. 529 (1991) (*aff'd*, 331 N.C. 743 (1992) .............. 40

*Higgins v. E.I. DuPont de Nemours & Co.*,
    863 F.2d 1162 (4th Cir. 1988) ...................................................... 20

v

*Hogan v. Forsyth Country Club Co.*,
    79 N.C.App. 483 (1986) .............................................................................. 38

*Jacobs v. N.C. Admin. Office of the Courts*,
    780 F.3d 562 (4th Cir. 2015) ......................................................... 21, 30, 32

*Katz v. Dole*,
    709 F.2d 251 (4th Cir. 1983) ...................................................................... 23

*Lingle v. Pain Relief Centers, P.A.*,
    No. 5:11-CV-168, 2013 WL 6732120 (W.D.N.C. Dec. 19, 2013) .............. 41

*McDonnell Douglas Corp. v. Green. Yashenko v. Harrah's NC Casino Co., LLC*,
    446 F.3d 541 (4th Cir. 2006) ...................................................................... 35

*Medlin v. Bass*,
    327 N.C. 587, 398 S.E.2d 460 (1990) ........................................................ 38

*Mercantile Peninsula Bank v. French*,
    499 F.3d 345 (4th Cir. 2007) ............................................................... 21, 32

*Miller v. Kenworth of Dothan, Inc.*,
    277 F.3d 1269 (11th Cir. 2002) .................................................................. 27

*Phillips v. J.P. Stevens & Co., Inc.*,
    No. 3:92CV00094, 1995 WL 794200 (M.D.N.C. May 1, 1995) ........... 43, 44

*Pueschel v. Peters*,
    577 F.3d 558 (4th Cir. 2009) ...................................................................... 21

*Rhoads v. F.D.I.C.*,
    257 F.3d 373 (4th Cir. 2001) ...................................................................... 35

*Skipper v. Giant Food Inc.*,
    68 F. App'x 393 (4th Cir. 2003) ................................................................. 23

*Taft v. Brinley's Grading Servs., Inc.*,
    738 S.E.2d 741 (N.C. Ct. App. 2013)......................................................... 41

*Tate v. First-Citizens Bank & Trust Co.*,
    5:07-CV-492-BO, 2009 WL 959971 (E.D.N.C. Apr. 8, 2009)............ 43, 44

*Tolan v. Cotton*,
    134 S.Ct. 1861 (2014)........................................................ 21, 30, 32

*Vance v. Ball State Univ.*,
    133 S.Ct. 2434, 186 L.Ed.2d 565 (2013)..................................... 23

## Rules and Statutes

28 U.S.C. § 1291 ...................................................................... 1

28 U.S.C. § 1331 ...................................................................... 1

28 U.S.C. § 1367 ...................................................................... 1

42 U.S.C. § 12203(b) ............................................................... 35

Fed. R. App. P. 4(a)(1)(A) ........................................................ 1

Fed. R. Civ. P. 56 ................................................................... 21

Fed. R. Civ. P. 56(c)............................................................... 20

## Other Authorities

Restatement (Second) of Agency § 91 (1958)..................................... 41

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

Appellant-Plaintiff Abigail Wilson ("Appellant" or "Ms. Wilson") filed her Complaint on January 9, 2013, in Gaston County North Carolina Superior Court, alleging claims under the Family Medical Leave Act ("FMLA") and North Carolina torts, including battery, intentional infliction of emotional distress, and negligent retention and supervision. After receiving a Right to Sue letter from the Equal Employment Opportunity Commission, Ms. Wilson filed her Amended Complaint on January 29, 2014, adding claims under Title VII of the Civil Rights Act of 1964 (retaliation and hostile work environment on the basis of sex) and the Americans with Disabilities Act ("ADA") (discrimination and retaliation). The District Court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

The District Court entered its Order granting summary judgment in this matter on November 6, 2015. The Fourth Circuit has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291 as an appeal of a final judgment entered by the District Court on November 6, 2015.

Appellant filed a Notice of Appeal on December 4, 2015, as required by Rule 4(a)(1)(A), Fed. R. App. P.

1

## STATEMENT OF THE ISSUES

1.  Whether Appellee-Defendant Gaston County, NC ("Appellee" or the "County") established as a matter of law that it did not subject Ms. Wilson to an actionable hostile work environment on the basis of her sex.

2.  Whether the County established as a matter of law that it did not retaliate against Ms. Wilson in violation of the ADA or FMLA.

3.  Whether the County established as a matter of law that it did not ratify co-worker Jim Putman's ("Putman") tortious conduct, subjecting it to tort liability for negligent retention and supervision.

4.  Whether the County established as a matter of law that it is not liable for the tort of battery that Putman committed upon Ms. Wilson.

5.  Whether the County established as a matter of law that it did not ratify Putman's severe and outrageous conduct, subjecting it to tort liability for IIED.

## STATEMENT OF THE CASE

Ms. Wilson brought suit against her former employer, Gaston County, and co-worker, Jim Putman, alleging that the County subjected her to a hostile work environment at the hands of Putman in violation of Title VII. She further alleged that the County unlawfully retaliated against her for reporting Putman's harassment. She also claimed that the Company violated the FMLA and ADA by retaliating against her for engaging in protected activity and discriminating against

2

her on the basis of a real or perceived disability. Finally, Plaintiff alleged that the County negligently supervised and retained Putman and that both Putman and the County should be liable for battery and IIED against her. On, March 31, 2015, after the close of discovery, Appellee moved for summary judgment. On November 6, 2015, the District Court granted the dispositive motion, finding that the County was no liable under any of the legal claims advance by Ms. Wilson. The remaining claims against Putman were remanded to state court. This appeal followed, and Ms. Wilson filed her Notice of Appeal on December 4, 2015.

**Statement Of Facts**

**I.    Ms. Wilson Begins Working for the County and Suffers a Serious Health Scare.**

On or around April 20, 2009, the County hired Ms. Wilson as a Gaston County Emergency Medical Services ("GEMS") EMT Paramedic. JA 121. After giving birth to one of her three children, Ms. Wilson decided that she wanted to become a Paramedic. *Id.* 122. The assistance that she received from the profession had a lasting impact on her. *Id.*

In September 2010, Ms. Wilson developed lumps in her breast and required surgery to have them removed. Ms. Wilson's mother passed away from breast cancer so Ms. Wilson was understandably shaken. *Id.* 510–11. On or around September 20, 2010, Ms. Wilson told her supervisor, Tommy Cleary, about the lumps and need for surgery. *Id.* 482–85. She told him that she would need to take

intermittent leave to see a specialist. Cleary told Ms. Wilson that he would talk to Chief Mark Lamphiear, and he explained that they would set up FMLA leave. The surgery was scheduled for October 2010. *Id.* 513.

Prior to Ms. Wilson's need for surgery, she received three speeding tickets during non-work time. She did not lose her license, but, under the County's policy, she had to cease driving. Ms. Wilson knew the policy and told Cleary what had happened. *Id.* 474–75.

Lamphiear told Cleary that he could not wait for Ms. Wilson's ticket to come off the books and that she was fired. *Id.* Co-workers Danny Dills, Susan Passmore, Roger Arrowood, and Dylan Kirkendall were all restricted from driving by the same policy that would have held back Ms. Wilson. *Id.* 477–81. Dills could not drive for the County for a year following a DUI. *Id.* 124–25, 361, 375, 477–79. Susan Passmore received multiple DUIs and was not allowed to drive for at least twelve months, potentially two years. *Id.* 362, 477–79, 481. Roger Arrowood could not drive for a year following a DUI. *Id.* 126*,* 373–75, 477–79. Yet, Chief Lamphiear selected Ms. Wilson for termination.

Ms. Wilson wrote to Chief Lamphiear and informed him that she would appeal her discharge. *Id.* 127. She noted that if there was a procedure change regarding speeding tickets she was never made aware of it. *Id.* Ms. Wilson filed a complaint with the United States Department of Labor ("USDOL"), and its

4

investigation determined that the County violated the FMLA by firing Ms. Wilson following her request for intermittent leave. *Id.* 128. The USDOL ordered the County to provide Ms. Wilson with lost wages and admonished it to comply with the FMLA in the future. *Id.* The County reinstated Ms. Wilson on or around October 19, 2010. *Id.* 546.

## II.    Ms. Wilson Returns to a Hostile Environment.

The County began holding Ms. Wilson to a higher performance standard than her co-workers. *Id.* 546–48. It wrote her up more often than her peers. *Id.* 129. The County disciplined her more than others for engaging in the same conduct. *Id.* 547. Assistant Chief Jeff Waldrep stopped speaking to Abby altogether. *Id.*

Upper management pressured Ms. Wilson's former supervisor, Tommy Cleary, to single out Ms. Wilson. *Id.* 131–32, 471–72. Indeed, Waldrep or Chief Lamphiear told Cleary to "dig deeper" into Ms. Wilson's performance and find fault. *Id.* 471–72, 502–03. In September 2010, Cleary issued Ms. Wilson a verbal warning, but when Chief Lamphiear got it he manually changed it to a written warning without showing it to Cleary. *Id.* 133, 499–501.

Meanwhile, Ms. Wilson's peers engaged in serious misconduct with virtually no consequences. For example, the County rotated Matt Piscatelli through several positions with the County because his supervisors found him to be incompetent. *Id.* 131–32. He was a danger to his patients. *Id.* Indeed, Piscatelli

made a major medical error during his probationary period that jeopardized a patient's life. *Id.* 131–32, 486–95. This was a terminable offense, especially for a probationary employee, but the County did not fire him. *Id.* Others, like Angela Carol and Susan Passmore, performed poorly as well with few consequences. *Id.* 496–98.

## III. The Hostile Environment Evolves and Sexual Harassment Enters the Picture.

### A. The County Hires Putman.

Putman came to GEMS after Mecklenburg County EMS fired him. *Id.* 432. It appears that it did so because Putman lost his temper and threw keys across a room at his female supervisor. *Id.* 149, 571–72.

At his interview with the County, Putman openly disclosed that his previous employer fired him. *Id.* 434. However, Putman's interviewers did not ask follow-up question about it. *Id.* 434–35. In December 2010 Putman was in the door. *Id.* 433.

### B. Putman Inappropriately Touches a Co-Worker.

In February 2011, Jessica Spurrier (née Coe) ("Ms. Spurrier") began working for GEMS as a Paramedic. *Id.* 137. Meanwhile, at some point prior to October 10, 2011, a female GEMS employee accused Putman of creating a hostile environment. *Id.* 157, 436–39. Chief Lamphiear, Assistant Chief Waldrep, and Operations Supervisor Jamie McConnell convened a meeting with Putman wherein

6

they questioned him about what had happened. *Id.* 157, 430–42. This meeting lasted between fifteen and thirty minutes. *Id.* 442. The result was a written warning for Putman. *Id.* 157, 439–42.

This incident likely caused the County to move Putman to Ms. Spurrier's shift, which happened days before or after the October 10, 2011, written warning. *Id.* 138–39, 149. Immediately, Ms. Spurrier found herself sharing a truck with Putman at work. *Id.* 138. Putman and Ms. Spurrier never joked around before— they barely knew one another. *Id.* 148.

One day soon thereafter, in Fall 2011, Putman started physically touching Ms. Spurrier. *Id.* 138. He poked and tickled her from the driver's seat. *Id.* 138, 563. He grabbed at Ms. Spurrier's side. *Id.* 138. This happened over a 15-minute time frame and she repeatedly told him to stop touching her. *Id.* 139–40. Ms. Spurrier was trying to do paperwork. *Id.* 140. Putman did not stop. *Id.* at 138–40.

Then, Putman opened the driver's side door and exited the vehicle. *Id.* 138, 141–42. Ms. Spurrier suspected that he was going inside the station, meaning that the touching would abate. *Id.* 142. Then, all of a sudden, Putman flung open the passenger side door and stepped up onto the running board. *Id.*

Putman resumed poking, tickling, and grabbing Ms. Spurrier. *Id.* 143. He got closer to her as he touched her. *Id.* She knew that she had to do something, so she began pushing him away. *Id.* 143, 150–51. In response, Putman grabbed her sides

7

and pulled himself closer to her, fighting the force of Ms. Spurrier's pushes. *Id.* 143, 150, 155. Ms. Spurrier told Putman to "stop" as she tried to get him off of her. *Id.* 143–44. Putman continued pulling closer, coming almost nose-to-nose with Ms. Spurrier. *Id.* 141–44, 154–56. Putman tilted his head, so their noses wouldn't touch, and went in for a kiss. *Id.* 144, 154–56. Before he could land it, Ms. Spurrier punched Putman in the stomach. *Id.* 141–44, 150–51, 155–56, 563. Putman would have kissed her against her will had she not used force. *Id.* 150–51, 155–56.

## C. Ms. Spurrier Informs the County That She Had to Punch Putman to Avoid an Unwanted Kiss.

Ms. Spurrier immediately reported this incident to her supervisors, Travis Adams[1] and/or Jamie McConnell. *Id.* 145–47. Ms. Spurrier explained that Putman made unwanted physical contact with her. *Id.* 146. She told them that he was in her personal space. *Id.* She made sure to say that she told Putman to stop and he would not listen. *Id.* 146–47. She got the point across that he tried to kiss her. *Id.* Ms. Spurrier even confessed that she had to punch Putman in the stomach to get him to back away. *Id* 146–47, 420–21. The County did not punish Putman as a result of this report. *Id.* 158–215, 449–51.

---

[1] Adams was technically an Assistant Operations Supervisor or Lieutenant, but in that role he regularly filled in for supervisors and did so at highly relevant times in this case. JA 455–56, 461–62.

### D.   Putman Begins Harassing Ms. Wilson.

In or around late October 2011, Ms. Wilson rode with Putman for the first time. *Id.* 580–81. Before this they had only seen each other in passing at work. *Id.* 582. Nothing unusual took place during this first ride *Id.* Ms. Wilson was friends with those on her shift, and initially the same went for Putman. *Id.* 583.

Putman quickly attempted to make the relationship sexual. *Id.* At work in or around early November 2011, Putman told Ms. Wilson that she had a "nice ass." *Id.* 583–85. Putman alternated between friendly and sexual behavior, and, as time passed, the sexual increasingly outweighed the friendly. *Id.* 585. This early conduct came verbally and via text message. *Id.* Ms. Wilson began avoiding him. *Id.* Putman kept texting, saying that Ms. Wilson had a pretty mouth and that he was dying to kiss her. *Id.* 587. Ms. Wilson never sent him anything sexual whatsoever. *Id.* 588.

In November 2011, Putman sent Ms. Wilson an unsolicited picture of his genitals. *Id.* 587–89. In or around late November 2011, Putman began physically touching Ms. Wilson at the workplace. *Id.* 593. He pulled her hair, poked her, and rubbed the back of her neck and face. *Id.* 122–23, 594–97. The touching was rampant. *Id.* 594–97. Ms. Wilson told him to stop, but he ignored her. *Id.* 122–23.

During a December 2011 shift, Putman told Ms. Wilson at least three times that he wanted to "fuck her." *Id.* 122–23. Ms. Wilson rebuffed him, but this only

angered Putman, and he eventually snapped. *Id.* That night, Ms. Wilson was sitting in a truck's passenger seat at Station 3 in Bessemer City and Putman was just outside. *Id.* 219–20, 594. Putman reached in and groped and grabbed Ms. Wilson, and she repeatedly and emphatically told him to stop. *Id.* 122–23. Putman then forcefully grabbed Ms. Wilson's thigh in an effort to drag her out of the truck. *Id.* Ms. Wilson fought back. However, Putman eventually ripped her from her seat. *Id.* 122–23, 597. Putman caught Ms. Wilson when she stumbled down and proceeded to pin her against the truck. *Id.* 597. Ms. Wilson struggled to get away. Putman groped Ms. Wilson's breasts, pelvic area, and genitalia. *Id.* When co-worker Jason Spurrier ("Mr. Spurrier") came around the truck, Putman let Ms. Wilson go and the sexual assault finally ended. *Id.*

Mr. Spurrier witnessed most of this incident. He saw Putman outside the truck while Ms. Wilson was in the passenger seat. *Id.* 219–20. He witnessed Putman grabbing, groping, and tickling Ms. Wilson. *Id.* Mr. Spurrier heard Ms. Wilson "[ask] him to stop repeatedly." *Id.* 219. He saw that, despite Ms. Wilson's pleas, "[h]e kept going." *Id.* This lasted for somewhere between two and five minutes. *Id.* 220, 225–26. The physical contact that he saw Putman make with Ms. Wilson's body was from her knees to shoulders. *Id.* 220–21. The last thing he recalled viewing was Putman pulling at Ms. Wilson, trying to force her out of the truck by grabbing her legs. *Id.* 223, 236. During this episode, Mr. Spurrier was

either in the truck's drivers' seat or outside the truck on the drivers' side, meaning that he was not in position to see Putman grope Ms. Wilson after he had succeeded in pulling her from the truck. *Id.* 223.

In early January 2012, Putman sent Ms. Wilson another picture of his genitals. *Id.* 600–01. Co-worker and fellow Paramedic Phil Parker saw this picture when Ms. Wilson showed him. *Id.* 424–27, 602–03. Ms. Wilson could see that Putman took this genital picture, like the first one, at the workplace because she noticed Putman's uniform top and that the backgrounds were the Station Two and Four restrooms, respectively. *Id.* 590–91, 602. Ms. Wilson put a data block on her phone to prevent further genital pictures, but the sexual texts kept coming. *Id.* 122–23 They included things like "I want to fuck you," and his desire to bend her over. *Id.* 122–23, 592. In others he asked Ms. Wilson to send him pictures of herself naked. *Id.* 122–23 She refused entirely. *Id.*

Days after the second genital picture, also in early January 2012, Putman slapped Ms. Wilson on the right butt cheek so hard that it left a hand-print bruise. *Id.* 598. Fellow Paramedic Tina Beheler watched it happen. Wilson and Beheler were outside a hospital near their trucks. *Id.* According to Beheler: ". . . [Putman] came out, and I heard a loud slap. And I seen him slap her, and she hollered at him." *Id.* 241. Ms. Beheler continued, "I don't recall exactly what [Ms. Wilson]

11

said; you know, 'Enough' or something. But I don't recall everything she said. She was mad. She wasn't happy." *Id.* Ms. Beheler's view was clear:

> I was standing right in front of [Ms. Wilson], and I probably wasn't a foot from her. Like she was standing directly in front of me when it happened. [Putman]—we were at the back of the ambulance bay, so when he came out, I would say he was maybe 3 to 5 feet and leaned over to pop her.

*Id.* 246–47.

Putman hit Ms. Wilson's bottom with tremendous force; according to Ms. Wilson:

> And when he hit me, it pushed me forward to such a degree that everything flew. The clipboard went flying. My glasses went flying. And he just kept walking, laughing when I was like, you know, "Stop. Stop touching me." And he just went off laughing. And [Beheler] told him, you know, that was unnecessary.

*Id.* 599. After this incident, Putman continued to physically touch Ms. Wilson against her will on a regular basis at the workplace through early March 2012. *Id.* 600, 607–08. Ms. Wilson began locking herself in trucks to keep safe from Putman. *Id.* 608. But she couldn't be locked away all the time, and he came straight for her when she was vulnerable. *Id.* 609.

### E.    Ms. Wilson Repeatedly Reports the Abuse to Management in Accordance With the County's Policy.

In November 2011, Ms. Wilson began reporting Putman's conduct to supervisors Adams and McConnell. *Id.* 521–24. This included the texting and touching. *Id.* 522. In December 2011, Ms. Wilson told McConnell about the bruise

12

that Putman had left on her when he pulled her from the truck. *Id.* 522–24. She specifically described the sexual assault to him: "I told [McConnell] about the incident down there where he groped me and left the bruise on my leg . . ." *Id.* 525.

Later in January 2012 Ms. Wilson went to Adams as well, stating:

You know, I've had two incidents now where he's left bruises on me that I'm having to explain to my husband. My husband wants to come down here. I'm getting text messages all the time. I want him to leave me alone.

*Id.* 122–23, 522–23. She continued:

It's getting to the point of being aggravating. I'm having to lock the ambulance doors anytime he's around because he'll come and open my door and stand in it and—and all sorts of other things. . . . You all need to do something.

*Id.* 526. Adams responded: "we'll handle it. Just stop here." *Id.* 522, 605–06. Ms. Wilson asked him if she needed to go to Chief Lamphiear, and Adams warned her not to speak with him about it. *Id.* 522. McConnell also told her not to complain to HR. *Id.* 520–21.

In January 2012, Ms. Wilson again pleaded with Travis Adams to get her off of Putman's truck. *Id.* 521. She told him that the abuse was continuing. *Id.* She specified that Putman had sent her pictures of his genitals. *Id.* 605–06. He told her that he would handle it, but nothing happened. *Id.* 521.

13

### F.    Ms. Wilson's Supervisors Witness Putman's Harassment.

McConnell and Adams saw Putman physically touch Ms. Wilson. *Id.* 569–70. In mid-to-late February 2012, Putman poked and prodded Ms. Wilson and pulled her hair in a shift meeting in front of Adams and McConnell. *Id.* They watched as Ms. Wilson told Putman to stop, but they did not respond to the touching. *Id.* 570. Before this, McConnell saw Putman touch Ms. Wilson at least once and Adams saw it two or three times. *Id.* Both had full knowledge that Putman had bruised Ms. Wilson on two separate occasions. *Id.* 522–25, 571.

### G.    Human Resources Investigates and Substantiates Ms. Wilson's Allegations.

#### 1.    Parker Becomes Involved, Which Triggers HR Action.

Phil Parker saw how Putman treated Ms. Wilson and it disturbed him. *Id.* 559–60. On or around March 4, 2012, Parker decided that he had to do something. *Id.* 609. That day, Parker saw Putman repeatedly poke Ms. Wilson in the side. *Id.* 415. Parker witnessed Ms. Wilson react and tell Putman to stop. *Id.* 416 Later that night, at 3:00 or 4:00 a.m., Parker and Ms. Wilson were together when Ms. Wilson got a text from Putman. *Id.* 417. Ms. Wilson turned to Parker and said, "How do I get him to stop?" *Id.* 417. Parker told her to ignore him. *Id.* Parker warned Ms. Wilson that he was going to say something to Putman in an attempt to put an end to the harassment. *Id.* 560.

14

Putman got to Ms. Wilson before Parker had a chance to speak with him. *Id.*
At the end of the shift, back at the station, Putman cornered Ms. Wilson in a supply
closet; its double-doors were open and Putman had an arm on each door. *Id.* 418,
560. Putman began pulling Ms. Wilson's hair and poking her. *Id.* 560. At this
time, Parker was behind a nearby glass door and noticed what was happening. *Id.*
Parker barged through the door and heard Ms. Wilson tell Putman: "Stop. Leave
me alone." *Id.* 418. Parker saw Putman grab Ms. Wilson's arm with force and,
again, heard her tell him to stop. *Id.*

An altercation ensued. Parker grabbed Putman and put him against a wall,
saying, "Enough's enough. Leave her alone. Get away from her. Don't text her.
Don't call her. Don't touch her. She's tired of it and I'm tired of watching it." *Id.*
418–19, 560–61. McConnell came down the hall into the fracas and took Putman
and Parker back to his office. *Id.* 407, 419.

### 2.    HR's Investigation Confirms Putman's Harassment.

HR began looking into Putman's sexual harassment when it discovered what
led to Parker and Putman's altercation. HR Coordinator Amia Massey interviewed
a number of employees, including Ms. Wilson, Putman, Adams, McConnell,
Parker, Ms. Spurrier, Adrienne Hill, and Travis Dellinger. *Id.* 248–50, 384–85. On
March 12, 2012, according to Massey's notes, Ms. Spurrier told her the following:

> It was one incident. I [was] riding with [Putman] and he was poking
> and tickling me. I was sitting still doing a call report when he came

around side of door and opened it. He put both hands on me and tickled me and put face close to me. Our face was almost touching. I said, "stop I don't like it." He stopped and I haven't had issue since that time.

*Id.* 248–49, 383–84. Massey's notes go on:

He continued to be inappropriate with other people. I witnessed it being done to [Ms. Wilson]—pulling hair and poking. There was an incident at Station 1 when Phil and [Ms. Wilson] were riding together. Jim came up joking with [Ms. Wilson]. [Ms. Wilson] was moving around saying get off me. At door, Phil said I've seen you do it repeatedly and you've been told to stop.

*Id.* 248, 383–84. Ms. Spurrier met with Massey for 15-30 minutes at Massey's office. *Id.* 152–53. Ms. Spurrier detailed the incident in which she was forced to punch Putman. *Id.* 153.

Massey's notes on Mr. Spurrier convey the following: "[Ms. Spurrier] has actually been harassed by [Putman]. He texted her, touched her several times, smacked her on the butt, tickling and poking in ear." *Id.* 248, 383–84.

Parker conveyed the harassment that he witnessed to HR Director Pam Overcash. *Id.* 251–52. He explained that he once told Ms. Wilson to report Putman's conduct to a supervisor, per the County's sexual harassment policy (*id.* 253–71), and Ms. Wilson responded that she already had. *Id.* 251. The policy and training asked employees to report harassment to their supervisors who would then have a duty to report it up the chain of command. *Id.* 253–70, 272, 274, 460–62.

16

Ms. Wilson had, in fact, previously repeatedly reported Putman's harassment to her supervisors, and she made this clear to HR as well. *Id.* 122–23, 521–24, 526.

Ms. Wilson prepared a hand-written note[2] that conveyed the abuse and her complaints and gave it to HR. *Id.* 527–29, 535. Massey typed a condensed version, and it is likely that she did so after losing the first page of Ms. Wilson's hand-written note because information is missing. *Id.* 529–30, 532–33, 535. Massey also told Ms. Wilson that she saw a video from the ambulance bay which showed Putman slap Ms. Wilson on the butt. *Id.* 552–53.

During the investigation, Ms. Wilson told Massey that Beheler witnessed the butt slap incident, but Massey decided not to interview Beheler. *Id.* 288, 388–89. She noted that Ms. Wilson said it happened and Putman said it did not, so, to Massey, it was a he-said-she-said situation. *Id.* 390–91. Massey said there was nothing to corroborate it. *Id.* 390. Yet, during the investigation Massey had Beheler's name on a witness list with the note "smacked bottom at hospital," yet Massey decided not to interview her. *Id.* 288, 390–92. What's more, though Massey knew that Mr. Spurrier possessed first-hand information on Putman's inappropriate touching of Ms. Wilson, she failed to interview him as well. *Id.* 227–

---

[2] The County alone was in possession of this note. Plaintiff does not have a copy. *Id.* 527–29. Yet, the County lost the first pages and to this day has not been able to locate it.

31, 554. The County did not require Putman to go on administrative leave during the investigation. *Id.* 157–215, 406–07.

Nevertheless, the investigation substantiated that Putman sexually harassed Ms. Wilson. A March 16, 2012, Memorandum from Massey to Chief Lamphiear explained as much:

> The investigation regarding the sexual harassment allegation filed by Mrs. [Wilson] has been concluded. Based upon the information presented during interviews, the allegation is substantiated.

*Id.* 85–86. HR recommended: (1) a written warning for "inappropriate touching and unwelcomed physical contact"; (2) a referral to EAP for work stress for Putman; and (3) a shift-change. *Id.*

In an email to his management level employees, Chief Lamphiear stated, "You know what was alleged, despite the lack of findings, and why we moved him to prevent any appearance of or opportunity for problems." *Id.* 289–90. He had read the March 16, 2012, memo (*id.* 85–86) at this point. *Id.* 367–72.

### H.     "Stage Two" Harassment.

Around a month after the HR investigation's findings, in mid-April 2012, the County changed Ms. Wilson's truck assignment, requiring her to switch trucks with Putman. *Id.* 122–23, 289–90, 554–58. They traded trucks at least fourteen times, all the while Ms. Wilson repeatedly complained to management, and the County finally moved Putman in mid-October 2012. *Id.* 557, 289–90.

18

Putman's harassment resumed when they started switching trucks. The first time that Putman was again alone with Ms. Wilson he threw his keys at her and called her a "bitch." *Id.* 562, 613–14. He told Ms. Wilson that she had caused problems with his wife. *Id.* 562. He slammed the side of his body into Ms. Wilson when he walked past her during these truck changes, trying to knock her off balance and often succeeding. *Id.* 613–14.

At this time, Adams was Plaintiff's only supervisor. *Id.* 558. She complained at least four times about Putman's behavior during the course of their shared shift changes. *Id.* 556–58. On one occasions, Adams told Ms. Wilson to "put on her big girl panties and deal with it." *Id.* 122–23. Adams then explained to co-worker Brandon Cherry that he told Ms. Wilson to "[p]ut on her big girl panties and deal with it." *Id.* 329–30.

## SUMMARY OF ARGUMENT

The District Court improperly applied the summary judgment standard and utilized inappropriate substantive law. First, the District Court improperly: (1) construed factual disputes in favor of the moving party; (2) made credibility determinations; and (3) failed to consider pertinent facts in the record. Its summary judgment grant on all claims at issue here—hostile work environment, FMLA and ADA retaliation, negligent retention and supervision, battery, and IIED—centered largely on Ms. Wilson's reporting of the underlying harassing conduct. Ms. Wilson

19

put forth a wealth of evidence that, when considered in its entirety in a light most favorable to her without drawing credibility determinations, shows that she sufficiently put the County on notice for her to prevail under these claims.

Second, the District Court applied the *Faragher/Ellerth* supervisory defense to Ms. Wilson's co-worker harassment case, which required instead a negligence standard. It also far too restrictively interpreted precedent regarding the content of the employer notice required to hold employers liable under negligent retention and supervision, battery, and IID. Moreover, it failed to consider the hostile work environment that the County permitted with respect to her ADA and FMLA retaliation claims. Accordingly, these significant fact questions should go to a jury, which could return a verdict for Ms. Wilson under the appropriate legal standards, and this Court should reverse the District Court's decision.

## **ARGUMENT**

### I.    **Standard of Review.**

Circuit courts' review of a grant of summary judgment is *de novo*. *Higgins v. E.I. DuPont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988). Courts can only grant summary judgment if there exist no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.

2548, 91 L. Ed. 2d 265 (1986). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (internal citations omitted). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.*

Courts must take all inferences from the underlying facts in favor of the non-movant, and, through that lens, consider whether a reasonable jury could find in favor of the non-moving party. *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Put another way, courts must view disputed facts in a light most favorable to the non-moving party. *Pueschel v. Peters*, 577 F.3d 558, 563 (4th Cir. 2009). Courts must not weigh evidence or make credibility determinations while undertaking this review. *Mercantile Peninsula Bank*, 499 F.3d at 352; *Jacobs*, 780 F.3d at 569; Fed. R. Civ. P. 56 Advisory Committee's Note (1963) ("Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."). Courts must also consider all evidence in the record. *Jacobs*, 780 F.3d at 569–71; *Tolan v. Cotton*, 134 S.Ct. 1861, 1866–68 (2014).

## II.    Ms. Wilson Forecasts Hostile Work Environment Evidence Sufficient to Meet the Legal Standard.

Ms. Wilson alleged that the County subjected her to a hostile work environment on the basis of her sex in violation of Title VII from roughly

21

November 2011 through October 2012. This claim centers on Ms. Wilson's supervisors becoming aware of actionable, repeated sexual harassment in November 2011 and failing to take action, allowing it to continue through March 2012. In March 2012, HR investigated and substantiated Ms. Wilson's allegations, resulting in Putman's transfer to a different shift. However, by April 2012 Ms. Wilson and Putman were interacting again during truck changes. Putman used this new access to again severely and pervasively harass Ms. Wilson on the basis of her sex. When Ms. Wilson complained to her supervisor, he, essentially, told her to deal with it. Ms. Wilson put forth evidence that would allow a reasonable jury to find in her favor on this claim. The District Court erred in granting the County's Motion here for two principal, and often related, reasons: (1) it misapplied Title VII sexual harassment precedent, and (2) it did so to facts that were construed out of line with the appropriate summary judgment standard of review.

### A.    The District Court Misapplied Law.

Plaintiffs must present evidence that would allow a jury to conclude that the harassment was (1) unwelcome, (2) based on sex, (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) imputable to the defendant. *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014), *EEOC v. Cent. Wholesalers, Inc.,* 573 F.3d 167, 175 (4th Cir.2009). In this case, Ms. Wilson's evidence firmly establishes that the

harassment was unwelcome, on the basis of her sex, and sufficiently severe or pervasive. The District Court deniesd summary judgment on the fourth element (imputation) alone.

For the purposes of imputing liability, The harasser's status is critical. Where the harasser is a co-worker, as is indisputably the case here, the employer is liable if it was negligent in failing to take effective action to stop harassment about which it knew or should have known. *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 331 (4th Cir. 2012); *Freeman*, 750 F.3d at 422–23. "On the other hand, where the harasser is the victim's supervisor, 'different rules apply' . . ." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (*quoting Vance v. Ball State Univ.*, 133 S.Ct. 2434, 2439, 186 L.Ed.2d 565 (2013). In co-worker cases like this one, the remedial action must be "reasonably calculated to end the harassment." *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983).

Management-level harassment notice regularly allows juries to impute knowledge. *See Freeman*, 750 F.3d at 422–23; *E.E.O.C. v. Fed. Express Corp.*, 188 F. Supp. 2d 600, 609 (E.D.N.C. 2000) ("Here, Plaintiff Zerehi–Carter reported the alleged conduct of her co-workers to her supervisors, and thus Federal Express had notice of her complaints."); *Carson v. Giant Food, Inc.*, 187 F. Supp. 2d 462, 480 (D. Md. 2002) *aff'd sub nom. Skipper v. Giant Food Inc.*, 68 F. App'x 393 (4th Cir. 2003) ("Giant argues that there is no evidence it should have known of the

alleged harassing conduct Carson was being subjected to by co-workers. However, Carson has presented evidence that he complained to managers about the actions. . . . Therefore, Giant managers knew about the alleged harassing conduct and Giant can be held liable for the racial harassment by Carson's co-workers.").

In *Freeman*, the Fourth Circuit reversed the lower court's grant of summary judgment in a hostile environment[3] case where the lower court had found that the harasser's conduct was not imputable to the employer. 750 F.3d at 424. This Court disagreed, holding that a jury could conclude that the employer had actual knowledge of the harassment specifically because the employee presented evidence that her supervisor knew. *Id.* at 423–24. There was evidence that the supervisor knew about the major alleged harassment incidents and even saw some of the harassing conduct. *Id.* at 423–24. The victim complained on multiple occasions and the supervisor ignored her. *Id.* There was evidence that the supervisor knew the harassment was ongoing. *Id.* Viewing the evidence in the light most favorable to the plaintiff below showed that the supervisor's knowledge would allow a jury to find that the employer had actual knowledge or, "at the very least," should have known. *Id.*

---

[3] This was a third-party harassment case. However, the Court explicitly adopted the co-worker notice standard, present here, and the analysis is identical. *Id.* at 422–23.

24

Here, Ms. Wilson's supervisors knew or, at worst, should have known about the alleged harassment and took no remedial action for months while Putman subject Ms. Wilson to further harassment. Ms. Wilson's supervisors knew about the most egregious incidents—the penis pictures, thigh grab, sexual assault, and hard butt slap and took no remedial action. JA 122–23, 520–26, 605–06. Adams and McConnell saw Putman harass Ms. Wilson against her will on multiple occasions. *Id.* 569–71. Ms. Wilson's supervisors ignored her and that which they witnessed. *Id.* 122–23, 520–27, 569–71, 605–06. Adams and McConnell knew the situation was ongoing because Ms. Wilson repeatedly told them as much. *Id.* And they knew that Putman had a track record of harassing women that pre-dated Ms. Wilson. *Id.* 138–47, 150–51, 154–57, 420–21, 436–42. As was the case in *Freeman*, a jury could find that the County knew, "or at the very least, should have known," of Putman's harassment. *Freeman*, 750 F.3d at 424; *see also Davis v. City of Charlottesville Sch. Bd.*, 498 F. App'x 231, 233 (4th Cir. 2012) ("Davis alleged that she immediately reported the first incident of harassment to a supervisor and that the harassment occurred again after she brought it to the attention of her employer. Davis thus sufficiently alleged facts that could demonstrate liability on behalf of her employer."). Therefore, Ms. Wilson sufficiently alleged facts sufficient to impute liability to the County.

25

However, in granting the dispositive motion, the District Court misapplied the law by using the *Faragher/Ellerth* supervisor standard instead of the co-worker negligence standard discussed above. It relied almost entirely on *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262 (4th Cir. 2001) even though that case dealt exclusively with supervisory harassment. *See id.* at 266–67. Specifically, the District Court cited *Barrett* for the proposition that the County's "reasonable harassment policy" provides "compelling proof" that the County worked to prevent and remedy sexual harassment. JA 115 (*citing Barrett*, 240 F.3d at 266). It then asserted that when Ms. Wilson finally followed that policy,[4] the County took reasonable action and, thus, acted reasonably, shielding it, as a matter of law, from any liability whatsoever. JA 115.

This cannot be. The court applied the *Ellerth/Faragher* supervisor defense. Allowing this application to stand would amount to a drastic change to employment discrimination jurisprudence—companies with full knowledge of harassment from one co-worker upon another could act as negligently as they please and avoid liability so long as the victim did not strictly adhere to the company's reporting policy. This ignores a litany of co-worker cases imputing liability where companies were aware of harassing conduct and negligently

---

[4] Nonetheless, Ms. Wilson strongly contests this point.

26

responded. *See*, *e.g.*, *Freeman*, 750 F.3d at 424. It also, in Ms. Wilson's case, specifically, let the County get away with knowing that Putman was sexually harassing Ms. Wilson for months, with full supervisory knowledge. The lower court erred in applying the proper precedent to the facts at hand.

The District Court also declined to credit other ways that a jury could impute knowledge to the County. First, it ignored case law on prior knowledge. Courts deem employers "on notice" of co-worker harassment where the employer is aware of prior instances of harassment by the same individual towards others, even without a complaint. *See, e.g., Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1279 (11th Cir. 2002) (holding employer liable despite fact that employee did not complain where management employees had knowledge of harassment); *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001) (finding employer liable for the plaintiff's sexual assault because it had knowledge of harasser's proclivity to engage in this conduct); *Davis v. United States Postal Serv.*, 142 F.3d 1334, 1342 (10th Cir. 1998) (finding that employer should have been put on notice even if the plaintiff did not complain because it was aware of previous complaints against the harasser).

In this case, the County knew that Putman harassed two separate female employees months, possibly weeks, before he targeted Ms. Wilson. The County issued Putman a written warning for creating a hostile environment for a female

employee in early October 2011. JA 157. McConnell, Adams, Waldrep, and Lamphiear were involved in that write-up. *Id.* 439–42. Then, the County transferred Putman and he targeted Ms. Spurrier. *Id.* 138–48, 150–51, 155–56. Putman began poking and grabbing her and pulled her body against her will towards him as he attempted to kiss her. *Id.* 141–44, 150–51, 154–56. Ms. Spurrier pushed against him and told him to stop but he wouldn't listen, tilting his head in anticipation of a forced kiss and only failing to land it because Ms Spurrier punched him. *Id.* 143, 150, 155–56. Ms. Spurrier reported these details to her supervisors. *Id.* 145–47. The County took no corrective action. *Id.* 158–215, 449–51. Thus, the County's prior knowledge of Putman's proclivity to engage in this conduct, *Ferris*, 277 F.3d at 136, alone should send this case to a jury.

Second, testimony that the County discouraged further reporting suffices for this element. Courts impute knowledge of sexual harassment where the employer's own supervisory employee discouraged further reporting. *See Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 59 (2d Cir. 1998).

When Ms. Wilson reported Putman's harassment, her supervisors specifically discouraged further action on her part. In January 2011 Ms. Wilson told Adams:

> You know, I've had two incidents now where he's left bruises on me that I'm having to explain to my husband. My husband wants to come down here. I'm getting text messages all the time. I want him to leave me alone.

JA 123, 523. She continued:

> It's getting to the point of being aggravating. I'm having to lock the ambulance doors anytime he's around because he'll come and open my door and stand in it and—and all sorts of other things. . . . You all need to do something.

*Id.* 526. Adams' told her that "we'll handle it. Just stop here." *Id.* 522, 605–06. Ms. Wilson asked him if she needed to go to Chief Lamphiear to get something to happen, and Adams warned her not to speak with him about it. *Id.* 522. McConnell also repeatedly discouraged further reporting. *Id.* 122–23, 520–21. For this reason as well, the District Court should have denied the County's Motion. Accordingly, the lower court's decision is erroneous and must be reversed.

### B. The District Court Improperly Construed Evidence in Favor of the Moving Party and Omitted Salient Facts.

Putting the hostile work environment precedent aside, the District Court also erred by construing factual disputes in the movant's favor, ignoring record evidence, and making credibility determinations, all missteps that dictate reversal.

#### 1. "Stage Two" Harassment Not Considered or, at Best, Not Properly Weighed.

The District Court did not analyze a second round of post-HR harassment between mid-April 2012 and mid-October 2012 and this amounts to reversible error. Following an HR investigation that substantiated Ms. Wilson's sexual harassment allegations (JA 85–86), the County continued to subject Ms. Wilson to

her abuser, allowing Putman to throw his keys at her, call her a "bitch," and try to knock her over and make other physical contact. *Id.* 122–23, 562, 613–14. Adams responded to Ms. Wilson's complaints by telling her to "put on her big girl pants and deal with it." *Id.* 123, 329–30. Adams told a co-worker that he said this to Ms. Wilson. *Id.* 329–30.

The District Court construed these facts in favor of the County to the point that it did not consider them with respect to Ms. Wilson's sexual harassment claim:

> At that time, Human Resources conducted an investigation and GEMS took action against Putman after it found her allegations to be substantiated. Additionally, Putman was transferred from his shift, first so that he would never work at the same place as Wilson, and then again so that they would never pass each other during a shift change. Because Wilson ultimately used the policies set forth in the policy against harassment, and as a result management made sure that any possibility of contact with Putman was removed, Wilson had not provided facts that could support an inference that GEMS circulated a dysfunctional or defective policy.

JA 115. The conclusion that "management made sure that sure that any possibility of contact with Putman was removed" ignores and improperly construes record evidence. The County left Putman interacting with Ms. Wilson, ramming into her, throwing keys at her, and calling her a bitch. When Ms. Wilson reported this to management, Adams told her to "put on her big girl pants and deal with it." *Id.* 123, 329–30. The Court's failure to consider this evidence is reversible error. *See Jacobs*, 780 F.3d at 569–71; *Tolan*, 134 S.Ct. at 1866–68. Thus, the Court should must reverse the lower court's decision.

## 2. The District Court Disregarded Ms. Wilson's Signed Declaration Even Though the District Court Gave Significant Weight to a Declaration Submitted by the County's Witness.

The District Court's decision to omit a signed declaration from Ms. Wilson amounts to error because that omitted declaration was record evidence. Specifically, Ms. Wilson's declaration contained information like:

- I reviewed the County's Summary Judgment brief and it misconstrues my deposition testimony with regard to my complaints. The idea that I confirmed under oath that I did not report Putman's abuse to any management level employees until March 4, 2012, ignores large portions of testimony. First of all, one of the complaint documents that the County's lawyer had me review during the deposition was missing at least one page and I made that very clear. Also, I could not have been clearer in my deposition that I repeatedly reported Putman's harassment to Travis Adams and Jamie McConnell, my supervisors, from November 2011 through March 2012. I even made clear that they saw Putman touch me against my will on numerous occasions. I just want to make sure the Court understands that the County's view of this is wrong.

- Putman touched me regularly against my will. He would pull my hair, poke me, and rub the back of my neck and face. I always told him to stop, but he ignored me. On numerous occasions, McConnell and Adams saw him do this.

- In January 2012, on one of the occasions where I complained to Adams, I said: "You know, I've had two incidents now where he's left bruises on me that I'm having to explain to my husband. My husband wants to come down here. I'm getting text messages all the time. I want him to leave me alone."

- During the HR investigation in March 2012, I made clear to Massey that I had told my supervisors, in detail, about what Putman had done to me. . . . I let Massey know that I had previously and repeatedly complained to Adams and McConnell . . .

31

- When Putman resumed the harassment when we started switching trucks in April 2012, I reported this abuse to Adams. At this time, Mitchell had deployed and Adams was my only supervisor.

- In response to one of my earliest complaints in or around April 2012, Adams told me to "put on my big girl panties and deal with it."

JA 122–23. The District Court did not mention this evidence in its ruling. However, it credited a declaration's averment helpful to the moving party's position. *Id.* 101. In ignoring Ms. Wilson's declaration, the District Court improperly failed to consider record evidence. *See Jacobs*, 780 F.3d at 569–71; *Tolan*, 134 S.Ct. at 1866–68. Any argument about the declaration's credibility is patently improper at the summary judgment stage and is precisely the type of analysis reserved for juries. *See Mercantile Peninsula Bank*, 499 F.3d at 352. This evidence is material—it goes to the heart of District Court's ruling on notice. Thus, this Court should reverse the District Court's decision.

### 3.    The District Court Construed Other Evidence Relevant to Imputation in Favor of Movant and Made Additional Credibility Determinations.

Finally, the District Court otherwise construed evidence in favor of the County. It also made significant credibility determinations. These actions were improper at the summary judgment stage. Specifically, the District Court improperly found as a matter of law and resolved the following:

- GEMS promoted a reasonable harassment policy.

32

- Ms. Wilson did not avail herself of the policy's remedial mechanism until March 2012.

- When Ms. Wilson availed herself of the policy's remedial mechanism, the County's HR department conducted an investigation and took action against Putman when it found Ms. Wilson's allegations to be substantiated.

- The County transferred Putman from his shift so, first, he and Ms. Wilson would not work at the same place and, second, so they would never pass each other during shift change.

- The County "made sure that any possibility of contact with Putman was removed . . ."

- The County did not act unreasonably.

JA 115. The District Court could not have reached these conclusions without construing material facts in the County's favor and making substantial credibility determinations. Taking them in turn, first, Ms. Wilson advanced sufficient evidence that she followed the County's policy months before HR's involvement. The policy and training asked employees to report harassment to their supervisors who would then have a duty to report it up the chain of command. *Id.* 253–70, 272, 274, 460–62.

33

Second, Ms. Wilson availed herself of the policy as early as November 2011. *Id.* 521–24. Viewing this evidence in the light most favorable to Plaintiff and making no credibility determinations, Plaintiff reported the harassment pursuant to the County's policy in November 2011. The lower court should not have pushed this date back to March 2012.

Third, the County did nothing for months after Ms. Wilson availed herself of the policy. Her supervisors had a duty to elevate the complaints and did not. The District Court improperly credited the County's actions.

Finally, the County did not make sure that any possibility of contact with Putman was removed because there continued to be contact until October 2012. *Id.* 289–90, 557. Plaintiff followed the County's policy and training and made her supervisors sufficiently aware of Putman's harassment in November 2011, the County did not act until March 2012, when the County moved Putman he regained access to Plaintiff and continued to harass her, and Plaintiff reported this harassment to her supervisor and he told her to deal with it. Viewing the facts in the light most favorable to Plaintiff and making no credibility determinations, the County acted unreasonably under any standard, especially the co-worker negligence standard. Thus, the District Court erred in granting summary judgment and this Court must reverse the lower court's decision.

III.    **The District Court Improperly Evaluated Plaintiff's FMLA and ADA Retaliation Claims.**

Ms. Wilson's FMLA and ADA retaliation claims should go to a jury. FMLA claims arising under the retaliation theory are analogous to those under Title VII and are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*. *Yashenko v. Harrah's NC Casino Co.*, *LLC*, 446 F.3d 541, 550–51 (4th Cir. 2006). To make out a retaliation claim a plaintiff must first make a prima facie showing "that he engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity." *Cline v. Wal–Mart Stores, Inc.,* 144 F.3d 294, 301 (4th Cir.1998). If the plaintiff "puts forth sufficient evidence to establish a prima facie case of retaliation" and the defendant "offers a non-discriminatory explanation" for his termination, the plaintiff "bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation." *Yashenko*, 446 F.3d at 550–51.

The same is generally true under the ADA—it prohibits retaliation, 42 U.S.C. § 12203(b), and to avoid summary judgment, plaintiffs must either produce direct evidence of a stated purpose to discriminate or indirect evidence of sufficient probative force to reflect a genuine issue of material fact. *See Rhoads v. F.D.I.C.*, 257 F.3d 373, 393 (4th Cir. 2001).

35

Hostile work environments on the basis of retaliation are prohibited. *See, e.g.*, *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 80 (D.D.C. 2013). As with other types of hostile work environments, the environment itself is the adverse action, and "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64–67, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).

Here, Ms. Wilson advances evidence sufficient to send these claims to a jury. Requesting and taking FMLA leave is protected activity. Also, the leave was an accommodation under the ADA. *See Guinup v. Petr-All Petroleum Corp.*, 786 F. Supp. 2d 501, 514 (N.D.N.Y. 2011) ("[T]aking medical leave is a protected within the meaning of the ADA."). The County held Ms. Wilson to a different standard than her non-disabled peers who did not engage in FMLA protected activity, and there is competent testimony that this is the case. JA 129, 131–32, 471–72, 502–03, 546–48, In fact, Lamphiear specifically directed management level employees to target Ms. Wilson. *Id.* 471–72, 502–03. A jury could find that the County's failure to remediate Putman's sexual harassment for four months was part and parcel of the County's retaliation against Ms. Wilson. Accordingly, the lower court's decision was erroneous, and this Court should reverse it.

**IV.**    **Ms. Wilson North Carolina Tort Claims Should be Decided by a Jury.**

Ms. Wilson brought North Carolina tort claims against the County for negligent retention and supervision, battery, and IIED. She alleged that she suffered both mental and physical harm as a result of Putman's abuse. She further claimed that the County should be liable for those harms because it knew about the underlying torts, and prior sufficiently similar tortious activity from Putman, for months and took no remedial action. Ms. Wilson forecasted evidence sufficient from which a jury could rule against the County. There are significant factual disputes and credibility determinations that, indeed, must be resolved by a jury. The District Court erroneously found otherwise, citing a lack of sufficient notice for all three of these claims. However, to reach that conclusion, it too narrowly construed the respective notice requirements and improperly applied the summary judgment standard.

**A.**    **The Evidence Shows That a Jury Could Conclude That the County Negligently Retained and Supervised Putman.**

Negligent Retention and Supervision's elements [5] include: (1) another employee committed a tort against the plaintiff; (2) the other employee's incompetence or unfitness; (3) the employer's actual or constructive notice of the

---

[5] Negligent retention and supervision are discussed together here because they include the same elements.

employee's incompetency or unfitness; and (4) injury to the plaintiff resulting from the employee's incompetence or unfitness. *Hogan v. Forsyth Country Club Co.*, 79 N.C.App. 483, 494–95 (1986). "Incompetency" means the tortfeasor's "unfitness or bad habits," or prior similar torts committed by the tortfeasor. *Medlin v. Bass*, 327 N.C. 587, 591, 398 S.E.2d 460, 463 (1990).

In this case, the County had actual or constructive notice of Putman's tortious behavior during two distinct time periods: November 2011–March 2012, Stage One, and mid-April 2012–mid-October 2012, Stage 2. The evidence here, for both stages, is sufficient, especially under the summary judgment standard. *See* "Stage One" JA 122–23, 138–47, 150–51, 154–57, 420–21, 436–42, 520–26, 569–71, 605–06 and "Stage Two" *id.* 122–23, 329–30, 562, 613–14. Viewed in the light most favorable to Ms. Wilson, this evidence would allow a jury to conclude that Putman had sexually harassed multiple distinct female employees before Ms. Wilson and that the County knew about the ongoing harassment that she was reporting.

The District Court construed these facts in the County's favor by downplaying Ms. Spurrier's report and ignoring Ms. Wilson's pre-HR reports to supervisors. First, with respect to Ms. Spurrier's report, the Court stated, "At that time, Spurrier told Adams and McConnell that Putman had invaded her personal

space and that she did not want to be partnered with him again." *Id.* 111. It continued:

> This isolated incident, which by Spurrier's account to supervisors was relatively minor, was significantly different than Wilson's allegations, which involve sustained attempts at physical contact, repeated sexual text messages, and two physical assaults.

*Id.* However, viewing the facts in the light most favorable to Ms. Wilson, Ms. Spurrier told her supervisors that she had to punch Putman in the stomach to prevent him kissing her. *Id.* 145–47. This is not a minor occurrence in any workplace. Also, it is not significantly different than what befell Ms. Wilson— unwanted, sexual physical contact at the workplace. In fact, it is eerily similar to the event, which Ms. Wilson reported to her supervisor (*id* 525), in which Putman pulled her from a truck and pinned her against her will. *Id.* 122–23, 219–21, 223, 225–26, 236, 597. The lower court did not view this evidence in the proper light.

Second, even putting the Spurrier report aside, the Court inappropriately discredited evidence that Ms. Wilson repeatedly informed her supervisors, McConnell and Adams, of the harassment, and that they witnessed it on multiple occasions. Such discrediting involved either viewing the evidence in the light most favorable to the County and/or making credibility determinations at the summary judgment stage. Both are improper.

Finally, narrowing the analytical window to post-HR investigation, when the County was undoubtedly on notice of the harassment's relevant details, the District

Court failed to mention the Stage II harassment. That harassment included unwanted physical contact, thrown keys, and verbal abuse. *Id.* 122–23, 562, 613–14. When Ms. Wilson reported it to her supervisor, he responded "put on your big girl pants and deal with it." *Id.* 123, 329–30. The lower court too narrowly construed the notice requirement here and applied it to facts that it took in a light much more favorable to the County than Ms. Wilson. Therefore, the Court should reverse the District Court's decision.

### B.    Ms. Wilson's Battery Claim Against the County Should Go to a Jury.

Plaintiffs establish battery when they show an intentional harmful or offensive contact made without privilege. *Hawkins v. Hawkins*, 101 N.C. App. 529, 533 (1991) (*aff'd*, 331 N.C. 743 (1992)). Actual damage is not an essential battery element. *Id.* In other words, "[t]he interest protected by the action for battery is freedom from intentional and unpermitted contact with one's person." *Dickens v. Puryear*, 302 N.C. 437, 445 (1981).

Plaintiffs establish *respondeat superior* liability with regard to employers for their employees' acts when: (1) the employee injured the plaintiff; (2) there was a master-servant, employer-employee, or principal-agent between the "tort feasor" and the individual or entity that the plaintiff seeks to hold liable; (3) the employee committed his act or wrong in the course of his employment or within the scope of his authority; and (4) the employee was engaged in the work of his superior at the

40

time of the injury. *Estes v. Comstock Homebuilding Companies, Inc.*, 195 N.C. App. 536, 540–41 (2009). Employers are also liable where they expressly authorize or ratify the employee's conduct. *See Taft v. Brinley's Grading Servs., Inc.*, 738 S.E.2d 741, 748 (N.C. Ct. App. 2013); Restatement (Second) of Agency § 91, Comment e, p. 235 (1958); *see also Equipment Co.*, 265 N.C. at 401, 144 S.E.2d at 258 (("[W]hen [principal] has such information that a person of ordinary intelligence would infer the existence of the facts in question, the triers of fact ordinarily would find that he had knowledge of such fact.") (*citing* Restatement (Second) of Agency, § 91, Comment c, p. 232 (1958)); *Lingle v. Pain Relief Centers, P.A.*, No. 5:11-CV-168, 2013 WL 6732120, at *8 (W.D.N.C. Dec. 19, 2013) ("Additionally, although the employer must have knowledge of all material facts related to its employee's acts, ratification may also be found where the employer has been provided with facts which would lead a person of ordinary prudence to investigate further, yet the employer fails to do so.") (internal citations and quotations omitted).

North Carolina courts routinely hold employers liable under more tenuous facts than those at hand. *See Bryant v. Thalhimer Bros., Inc.*, 113 N.C. App. 1, 16 (1993) (finding employer ratified sexual harassment where it failed to respond to reports of said harassment); *Brown v. Burlington Indus., Inc.*, 93 N.C.App. 431, 438 (1989) (report to department manager who failed in his duty to notify his

41

superior of sexual harassment complaint, but failing to do so was sufficient to show ratification of underlying sexual harassment); *Denning-Boyles v. WCES, Inc.*, 123 N.C. App. 409, 417 (1996) (holding that plaintiff presented a sufficient forecast of evidence upon which a jury could find that company learned of facts regarding manager's sexual harassment of plaintiff which would have led a reasonable person 'to investigate further,' . . . and that its failure to do so showed WCES was "willing to ratify upon the knowledge which [it had].").

Here, viewing the evidence in Ms. Wilson's favor, the County knew exactly what Putman was doing. During Stage One of the harassment Ms. Wilson reported the unwanted touching, and the County's management-level employees even saw it. Stage Two is even more apparent—the County put Ms. Wilson in Putman's path after HR substantiated Ms. Wilson's complaints. Putman then battered her again. The District Court substantially downplayed the notice that Ms. Wilson established with record evidence. This included management actually witnessing multiple batteries. The County had sufficient material facts to have ratified the batteries at issue. Had the lower court applied the proper precedent and summary judgment standard, it could not granted the County's Motion. Therefore, this Court must reverse its decision.

### C.    The District Court's Decision to Grant Summary Judgment on Plaintiff's IIED Claim is Similarly Flawed.

To prevail on North Carolina IIED claims, plaintiffs must show that they were subjected to extreme and outrageous conduct at the hands of the defendants that was intended to cause, and did cause, severe emotional distress. *Dickens v. Puryear*, 276 S.E.2d 325, 335 (N.C. 1981). North Carolina courts consistently find workplace sexual harassment like that at issue here sufficiently extreme and outrageous to make out an IIED claim. *See, e.g., Brown*, 93 N.C. App. at 435 (finding that manager's sexual remarks and gestures toward employee occurring over an extended period of time constituted conduct which was reasonably and sufficiently outrageous to permit recovery); *Phillips v. J.P. Stevens & Co., Inc.*, No. 3:92CV00094, 1995 WL 794200, at *13 (M.D.N.C. May 1, 1995) (holding supervisor's conduct was sufficiently extreme and outrageous where supervisor "made sexually suggestive remarks to [plaintiff] over an extended period of time, and during this period of harassment, physically touched [plaintiff] in a sexual manner several times."); *Tate v. First-Citizens Bank & Trust Co.*, 5:07-CV-492-BO, 2009 WL 959971, at *6 (E.D.N.C. Apr. 8, 2009) (denying motion for summary judgment on IIED claim where supervisor made sexually suggestive movements like fondling himself and sexually suggestive gestures on nearly a daily basis and touched the plaintiff's buttocks).

In this case, a jury could find for Ms. Wilson on her IIED claim. The workplace conduct that Ms. Wilson faced was as extreme and outrageous as that confronted by the plaintiffs in *Brown*, *Phillips*, and *Tate*. She suffered repeated verbal and physical abuse. *See supra* FACTS III.D–H. Indeed, this behavior resulted in severe emotional distress. JA 297–322. However, the lower court used the same reasoning here to avoid a ratification finding. JA 109–10. Again, the District Court reached this conclusion by too narrowly applying the law, resolving factual disputes in the County's favor, omitting record evidence, and making credibility determinations. Therefore, the lower court erred in granting summary judgment, and this Court must reverse its decision.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant respectfully contends that the District Court erred in granting summary on Ms. Wilson's claims for Title VII hostile work environment on the basis of sex, FMLA and ADA retaliation, battery, intentional infliction of emotional distress, and negligent retention and supervision. Accordingly, Plaintiff requests that this Court reverse the lower court's decision.

## REQUEST FOR ORAL ARGUMENT

Ms. Wilson hereby requests oral argument. This case deals with the District Court's application of a Title VII hostile work environment defense created for supervisory harassment and its application to co-worker sexual harassment. It

44

further involves an alleged misapplication of the summary judgment standard of review. Also, this case explores whether permitting a sufficiently severe or pervasive hostile work environment on the basis of sex following activity protected by the FMLA and ADA amounts to unlawful retaliation. Finally, this case deals with the North Carolina torts of battery, IIED, and negligent retention and supervision. Oral argument will allow Appellant and Appellee's counsel to answer any questions that the Court may have.

This the 3rd day of March, 2016.

Respectfully Submitted,

ABIGAIL WILSON

By: /s/ Sean F. Herrmann
Sean F. Herrmann (NC Bar No. 4445)
sean@vankampenlaw.com
Joshua R. Van Kampen (NC Bar No. 32168)
josh@vankampenlaw.com
Van Kampen Law, PC
225 East Worthington Avenue
Charlotte, North Carolina 28203
Phone: 704-247-3245
Fax: 704-749-2638
*Attorneys for Appellant*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 15-2522          **Caption:** Abigail Wilson v. Gaston County, NC

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓] this brief contains _____10,840_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓] this brief has been prepared in a proportionally spaced typeface using
   MS Word 2010 _____ [*identify word processing program*] in
   Times New Roman, 14 point _____ [*identify font size and type style*]; **or**

   [ ] this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) Sean F. Herrmann _____

Attorney for appellant _____

Dated: 3/3/2016 _____

# CERTIFICATE OF SERVICE

I certify that on <u>3/3/2016</u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

PAUL H. DERRICK
DERRICK LAW GROUP
P.O. Box 37665
Raleigh, NC 27627
(919) 624-3324

MARTHA R. THOMPSON
STOTT, HOLLOWELL, PALMER &
WINDHAM
P.O. Box 995
Gastonia, NC 28053
(704) 864-3425

/s/ Sean F. Herrmann
—————————————————
Signature

3/3/2016
—————————————————
Date