**RECORD NO. 15-2522**

In The

# United States Court Of Appeals
## For The Fourth Circuit

## ABIGAIL WILSON,

*Plaintiff – Appellant,*

v.

## GASTON COUNTY, NC,

*Defendant – Appellee.*

and

## JIM N. PUTNAM, III,

*Defendant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT CHARLOTTE**

———————

## BRIEF OF APPELLEE

———————

**Paul H. Derrick**
**FREEMAN MATHIS & GARY, LLP**
**5540 Centerview Drive, Suite 200**
**Raleigh, North Carolina 27606**
**(919) 424-3850**

**Martha Raymond Thompson**
**STOTT, HOLLOWELL, PALMER**
 **& WINDHAM, L.L.P.**
**401 East Franklin Blvd, P.O. Box 995**
**Gastonia, North Carolina 28053**
**(704) 864-3425**

*Counsel for Appellee*

*Counsel for Appellee*

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than only one attorney. Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No.   15-2522           Caption:    Abigail Wilson v. Gaston County, NC

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____Gaston County, NC_____   who is _____Appellee_____,
      (name of party/amicus)                (appellant/appellee/amicus)


1.    Is party/amicus a publicly held corporation or other publicly held entity?
      [ ]            Yes            [X]            No

2.    Does party/amicus have any parent corporations?
      [ ]            Yes            [X]            No

      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?
      [ ]            Yes            [X]            No

      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?
      [ ]            Yes            [X]            No

      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)
      [ ]            Yes            [X]            No

      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?
      [ ]            Yes            [X]            No

      If yes, identify any trustee and the members of any creditors' committee:


/s/ Martha R. Thompson                                    April 8, 2016
      (signature)                                              (date)

# **TABLE OF CONTENTS**

**Page:**

TABLE OF AUTHORITIES ................................................................. iii

I.    STATEMENT OF THE CASE .................................................1

      Facts ...............................................................................1

II.   SUMMARY OF THE ARGUMENT ..........................................13

III.  ARGUMENT.....................................................................14

      A.   Standard of review.....................................................14

      B.   Wilson cannot prove her hostile work environment claim .................15

           1.   Wilson cannot show a prima facie case of sexual harassment against Gaston County under any standard ..........15

           2.   The District Court correctly applied the law ............................18

           3.   Gaston County was not on notice regarding Putman's alleged propensity to engage in sexual harassment .................20

      C.   The District Court fully considered the record and evidence ............21

      D.   Gaston County did not retaliate against Wilson.................................24

      E.   The District Court properly granted summary judgment regarding Wilson's state law tort claims............................................27

           1.   Gaston County did not negligently retain or supervise Putman ............................................................28

           2.   Wilson failed to provide all material facts to Gaston County regarding the alleged battery by Putman ....................30

           3.   Wilson failed to make a prima facie showing for IIED............32

IV.   CONCLUSION.................................................................35

V.   CERTIFICATE OF COMPLIANCE

VI.   CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Adams v. Anne Arundel County Public Schools*,
  789 F. 3d 422 (4th Cir. 2015) ........................................................26

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...................................................................14

*Atkins v. USF Dugan, Inc.*,
  106 F. Supp. 2d 799 (M.D.N.C. 1999) ............................................33

*Barret v. Applied Radiant Energy Corp.*,
  240 F.3d 262 (4th Cir. 2001) ...................................................16, 17

*Brown v. Burlington Indus., Inc.*,
  93 N.C. App. 431, 378 S.E.2d 232 (1989) .......................................31

*Burlington Indus., Inc. v. Ellerth*,
  524 U.S. 742 (1998) ...............................................................16, 23

*Cline v. Wal-Mart Stores, Inc.*,
  144 F.3d 294 (4th Cir. 1998) ........................................................25

*Dickens v. Puryear*,
  302 N.C. 437, 276 S. E.2d 325 (1981) ................................. 30, 32-33

*Ennis v. Nat'l Ass'n of Bus. & Educ. Radio*,
  53 F.3d 55 (4th Cir. 1995) ......................................................15, 25

*Frazier v. First Union Nat. Bank*,
  747 F. Supp. 1540 (W.D.N.C. 1990) ...............................................33

*Freeman v. Dal-Tile Corp.*,
  750 F.3d 413 (4th Cir. 2014) ....................................................18, 19

*Gentry v. East West Partners Club Management Company, Inc.*,
  ___ F.3d ___, (No. 14-2382) (4th Cir. 2016) ...................................26

*Graham v. Hardee's Food Sys., Inc.*,
   121 N.C. App. 382, 465 S.E.2d 558 (1996) ...........................................28, 29

*Halperin v. Abacus Technology Corp.*,
   128 F.3d 191 (4th Cir.1997) ...........................................................19, 32

*Hartsell v. Duplex Products, Inc.*,
   123 F.3d 766 (4th Cir. 1997) ....................................................................28

*Hogan v. Forsyth Country Club Co.*,
   79 N.C. App. 483, 340 S.E.2d 116, *disc. rev. denied*,
   317 N.C. 334, 346 S.E.2d 140 (1986) ...............................................31, 33, 34

*Jackson v. FKI Logistex*,
   608 F. Supp. 2d 705 (E.D.N.C. 2009) .........................................................28

*Jacobs v. N.C. Admin Office of the Courts*,
   780 F.3d 562 (4th Cir. 2015) ................................................................23, 24

*Laber v. Harvey*,
   438 F.3d 404 (4th Cir. 2006) ................................................................25, 26

*McLean v. Patten Communities, Inc.*,
   332 F.3d 714 (4th Cir. 2003) ....................................................................28

*Nichols v. Ashland Hosp. Corp.*,
   251 F.3d 496 (4th Cir. 2001) ....................................................................25

*Ocheltree v. Scollon Productions, Inc.*,
   335 F.3d 325 (4th Cir. 2003) ....................................................................16

*Schulze v. Meritor Automotive*,
   163 F. Supp. 2d 559 (W.D.N.C. 2000).........................................................15

*Simmons v. Chemol Corp.*,
   137 N.C. App. 319, 528 S.E.2d 368 (2000) .................................................33

*Singleton v. Dep't of Corr. Educ.*,
   115 Fed. App'x 119 (4th Cir. 2004).........................................................15

*Strickland v. Jewell,*
    562F.Supp.2d 661 (M.D.N.C. 2007) ............................................19

*Thomas v. N. Telecom, Inc.,*
    157 F. Supp. 2d 627 (M.D.N.C. 2000) ...................................32, 33

*Vance v. Ball State Univ.,*
    133 S. Ct. 2434 (2013)..............................................................17

*Waddle v. Sparks,*
    331 N.C. 73, 414 S.E.2d 22 (1992)...........................................28

*Wagoner v. Elkin City Schs' Bd. of Educ.,*
    113 N.C. App. 579, 440 S.E.2d 119 (1994) ...............................34

*Wilson v. Southern Nat'l Bank,*
    900 F. Supp. 803 (W.D.N.C. 1995) ...........................................33

## <u>Statutes</u>:

29 U.S.C. § 2601 ("FMLA") ......................................................*passim*

29 U.S.C. § 2716(a)(1)(A)(i)(I) .......................................................24

42 U.S.C. § 12101 "(ADA")..........................................................12, 25

42 U.S.C. § 2000e
    Title VII of the Civil Rights Act of 1964 ...............................15, 30

# I.    STATEMENT OF THE CASE

**Facts**

In her brief [Doc. #15], Appellant-Plaintiff Abigail Wilson ("Wilson") makes numerous factual misstatements and exaggerations in an apparent effort to present the Court with a distorted record that is favorable to her. Although it is true that, as the non-moving party, Wilson is entitled to reasonable inferences, Gaston County provides the following *undisputed* factual recitation to provide the Court clarity on the pending issues.

Wilson was hired by Gaston Emergency Medical Services ("GEMS") as a paramedic in April 2009. [Joint Appendix "JA" at 121]. In September 2010, Wilson informed her supervisor, Tommy Cleary, that she had developed tumors in her breast and needed time off to have the tumors surgically removed[1]. [JA at 482-85]. Wilson was offered a form to fill out for FMLA leave, as she had already used all of her sick days, but she refused. [JA at 359-60]. Nonetheless, Wilson admits that no one from Gaston County ever told her she could not take FMLA leave. [JA at 577-78]. Ultimately, she chose not to submit a request for FMLA leave.  [JA at 572].

Around that same time, Gaston County became aware that Wilson had received three (3) traffic citations for moving violations within the preceding

---

[1] Notably, the tumors actually were benign and, to this day, Wilson has chosen not to have the surgery she then claimed to need. [JA at 573].

months, all of which occurred while she was off-duty in her personal vehicle. [JA at 537-42]. As a result of the citations, the insurance policy covering GEMS employees precluded her from operating a GEMS vehicle for at least 18 months. [JA at 375-76]. Thus, on October 12, 2010, Wilson was discharged due to the number of moving violations she had received, but it was noted on her record that she was eligible for reinstatement after her driving record had cleared. [JA at 29-30, 542]. Although Wilson complains in her Brief about other employees, she admits that she is unaware of any other GEMS employee who had amassed that many moving violations or whose driving could not be cleared for at least 18 months. [JA at 545].

The day after she was terminated for having too many traffic violations, Wilson submitted a handwritten appeal to GEMS Chief Mark Lamphiear; FMLA leave was not mentioned anywhere in the appeal. [JA at 127]. At the time the decision was made to discharge Wilson, neither Chief Lamphiear nor Deputy Chief Jeff Waldrep had any idea that Wilson might have a need to take FMLA leave. [JA at 68-70, 378]. Nonetheless, on October 28, 2010, less than a week after her discharge, Wilson was reinstated, placed on FMLA leave, and promptly given full back pay and benefits. [JA at 57-59, 546]. Wilson admits that she was made whole and suffered no financial loss as a result of her termination. [JA at 579].

Wilson claims she returned to a hostile work environment where she was suddenly held to higher standard than others by being disciplined more harshly and by Assistant Chief Waldrep not speaking to her. [Doc. #15 at 5]. To support these conclusions she relies upon her own testimony. She also cites to a document showing the write-ups other employees received during the same timeframe, but that document belies her position. [JA at 129]. That document is based on data compiled by Gaston County and demonstrates that numerous other employees received at least as many disciplinary write-ups as Wilson and, in some cases, *many* more write-ups. [JA at 77].

For example, Wilson received only one disciplinary write-up in 2010, while 45 other employees received two or more write-ups. [JA at 129]. In 2011, Wilson was written up three times, but 23 other employees received at least that many. [*Id.*]. In 2012, Wilson was written up twice, but 49 other employees also received two or more write-ups, with some employees receiving as many as 11-14 write-ups. [*Id.*]. Unfortunately for Wilson, the statistics resoundingly show the same patterns for 2013 and 2014. Wilson was written up three times in each of those years, but 29 of her co-workers also received between three and 11 write-ups. [*Id.*]. Thus, rather than substantiating Wilson's allegations that she was unlawfully singled out for harsher and more frequent discipline than other employees, the

undisputed data in the record show that literally dozens of Wilson's co-workers were written up much more often than she ever was.

In her brief, Wilson broadly complains that other employees were not treated as harshly as she was. [Doc. #15 at 5-6]. What Wilson conveniently fails to mention, however, are the disciplinary write-ups she received for misconduct that she admits committing. Those include: in May 2009, she was disciplined for backing into a post [JA at 31-55]; on September 4, 2010, she was written-up for taking unauthorized leave on two days in August 2010 [*Id.*]; in August 2011, she received a written warning for text messaging while on an active EMS response [*Id.*]; on October 10, 2011, she received a written warning for unauthorized use of leave [*Id.*]; that same month, she was written up for professional misconduct [*Id.*]; on December 19, 2011, she received a warning regarding for failing to follow a medical protocol [*Id.*]; another warning was given on February 9, 2012, for again failing to follow GEMS's medical protocols [*Id.*]; on August 3, 2012, she was cited for third-party sexual harassment [*Id.*]; she received a written warning on February 2, 2014, for unsatisfactory work performance [*Id.*]; on May 20, 2014, she received a verbal reminder regarding her improper use of sick leave [*Id.*]; and in August 2014, she was given a written warning regarding improper use of social media [*Id.*]. Notably, although she was written up several times prior to her termination, Wilson received no write-ups for almost a year after her reinstatement in 2010.

4

Again, Wilson admits that she did commit most, if not all, of the infractions in question and that the write-ups were warranted, pursuant to protocol, but she nonetheless contends that they somehow constituted unfair targeting of her. [JA at 519]. The record is devoid of any evidence that Wilson ever informed Human Resources or any manager that she believed she was being targeted for unfair discipline. [JA at 396-97].

There is no evidence in the record that Wilson was evaluated differently than other employees or that she was targeted for discipline. Chief Lamphiear testified that he never instructed anyone to evaluate Wilson differently or to target her for disciplinary action [JA at 377, 379], nor has he seen evidence that she was evaluated differently or targeted. [*Id.*]. Captain James McConnell likewise testified that he did not target Wilson for write-ups and was never instructed to do so by his superiors. [JA at 404-05, 409]. Deputy Chief Waldrep echoed McConnell's testimony. [JA at 64].

In or about April 2009, shortly after Wilson was hired and long before she alleges that she engaged in any protected activity, directives were sent to all captains from Chief Lamphiear and/or Deputy Chief Waldrep that they should scrutinize the work of employees on their shifts. Thomas Cleary was Wilson's shift captain and was directed to "dig into any issue … until I could find anything wrong" with the performance of Wilson **and others**. [JA at 467-71]. Other

5

captains were directed to do the same thing regarding the employees on their shifts. As a result of those directives, Wilson and others were written up for a variety of infractions. [JA at 467-74].

Wilson spends a considerable part of her brief discussing the hiring of Jim Putman and his supposed harassment of Jessica Spurrier. [Doc. #15 at 6-8]. Contrary to Wilson's characterizations, however, Ms. Spurrier herself described Putman's actions as "more annoying than anything else." [JA at 91]. Ms. Spurrier stated that she reported Putman and requested not to be partnered with him. [JA at 92]. Her requested was granted and she had no further problems with him. [JA at 92]. Despite Wilson's present claim that when Spurrier informed her "supervisor" about the situation, she "got the point across that he tried to kiss her" [Doc. #15 at 8], what Ms. Spurrier actually stated was that she couldn't recall the "correct verbiage" but stated only that her personal space was broken. [JA at 147]. The bottom line was that Ms. Spurrier made a request to GEMS that she did not want to be paired with Putman, that request was honored, and she admittedly had no further issues with him.

Wilson's brief states that a shift in late October 2011 marked the "first time" she and Putman were assigned to ride together, suggesting that other such pairings followed that kept her in contact with Putman. [Doc. #15 at 9]. Actually, however, Wilson admitted in her deposition that she and Putman were *never* assigned to be

partners and that they rode together *only* on that one occasion. [JA at 580-82]. As Wilson admitted in her brief, nothing unusual or inappropriate happened during that shift.

In November 2011, Wilson asserts that Putman began sending her inappropriate text messages[2], making rude comments, and touching her[3]. Per Wilson, this continued into December 2011. Another incident occurred in January 2012, where Wilson claims Putman sent a picture of his genitals to her. [Doc. #15 at 11]. Wilson states she showed the picture to co-worker, Phil Parker. [Doc. #15 at 11]. However, during his deposition Parker testified that he actually has no firsthand knowledge that Putman ever sent inappropriate pictures to Wilson. [JA at 421].

Wilson alleges that she informed Travis Adams, who was a non-supervisory Lieutenant at the time, and Capt. McConnell that Putman had acted improperly toward her[4]. [Doc. #15 at 12]. Yet, in her deposition testimony, Wilson admitted that she failed to describe the incidents as something that reasonably could have been construed as unlawful sexual harassment. [JA at 525]. In fact, she described

---

[2] Wilson admitted to still being in possession of the cell phone, but refused to produce it for inspection during discovery, despite requests by all Defendants. [JA at 551; SJA at 14].

[3] Wilson claimed that Putman would poke her, pat her, and pull her hair in a playful manner, but she also admitted that other co-workers engaged in similar conduct, as well. [JA at 83-4, 615-616; SJA at 9-11].

[4] Lt. Adams and Capt. McConnell deny they knew of any sexual harassment before March 2012. [JA at 66, 408, 458].

Putman's conduct as aggravating, childish, and something a second grader would do. [JA at 596].

Wilson asserts, through nothing more than her own supposition, that Capt. McConnell and Travis Adams witnessed Putman harassing her. [Doc. #15 at 14]. Even assuming the correctness of some of Wilson's guesswork as to what Capt. McConnell and Travis Adams did or did not see, there is no evidence at all that they were provided the supposed "back story" regarding Putman's alleged behavior. Indeed, Wilson testified that other co-workers engaged in the same kind of playfulness that she now *thinks* Capt. McConnell and Travis Adams witnessed by Putman. [JA at 615-16].

Gaston County became aware of the incidents on the morning of March 4, 2012. Capt. McConnell overheard a commotion outside his office. [JA at 407]. He went to investigate and found employee Phil Parker yelling at Putman. [*Id.*]. Capt. McConnell learned that the dispute arose from Parker's attempts to admonish Putman after being told by Wilson that Putman had engaged in misconduct toward her. [*Id.*]. That was the first time that Capt. McConnell heard of any allegations of misconduct involving Wilson and Putman. [JA at 408]. Capt. McConnell began an inquiry into the underlying cause of the incident between Parker and Putman.

After the episode between Putman and Parker, Wilson still was not fully forthcoming with management about what allegedly had been going on. Instead,

Capt. McConnell told her that GEMS and Gaston County had to get to the bottom of things, and he directed Wilson to write a statement about any problems she was having with Putman. She prepared a nine-page handwritten document, the front page of which cannot presently be located by any party. [Supplemental Joint Appendix "SJA" at 1-8]. In that statement, which Wilson affirmed in her deposition to be completely truthful and accurate, she says that Putman began acting inappropriately toward her in December 2011, but that she did not tell anyone about it other than non-supervisory co-workers Jason Spurrier, Travis Dellinger, Jessica Coe, Tina Beheler, and Phil Parker. [JA at 531-32, SJA at 3].

Wilson wrote that she "did not feel comfortable complaining because of my history at GEMS, that I knew Jim [Putman] was the only source of income for his wife and small child and that I just did not want to rock the boat." [SJA at 4]. She went on: "[T]hen I learned that Jim's wife was pregnant with twins, which only furthered my resolve to try to put up with it for his family's sake." [*Id.*]. She further stated, "I went to Captain Mitchell on 2-28-12, [just four days ago], at my partner's (Phil) urging. I did not go into much detail with Captain Mitchell, only advising him of the time that Jim bruised my leg before Captain Mitchell came on our shift.…Captain Mitchell advised me that he would make sure that I would not be on a truck with Jim." [SJA at 4-5]. Finally, Wilson again acknowledged that she had not previously reported Putman's alleged harassing behavior to management,

saying: "I see now that I should have reported everything but I thought I was doing what was best for my career, GEMS, our shift, and Jim's family. … I now regret keeping quiet and wished that I would have come forward on that first day. But hindsight is 20/20 and I can't undo it." [SJA at 7-8][5].

A short while later, a typed statement containing essentially the same facts was signed by Wilson and provided to Gaston County during the course of the investigation. [SJA at 9-11]. In her brief, Wilson speculates, with no support, that the typed version was prepared because the first-page of the hand written statement was lost. [Doc. #15 at 17]. Regardless of the reason, Wilson testified in her deposition that this typed statement is also completely truthful and accurate. [JA at 531-32, 534-35]. In the typed statement, Wilson reiterated the same critical admissions that were contained in her handwritten statement (i.e., she chose not to report Putman's actions to GEMS or to Gaston County HR because she did not want to be confrontational, she did not want to make things difficult for Putman's wife and family, she did not want to cause problems for Putman, she knew she should have brought the matter to the attention of management but did not want to "rock the boat," and she thought that the problem would simply disappear if she kept quiet about it.). [SJA at 11].

---

[5] Also, Parker admitted he has no knowledge as to whether Wilson ever complained to anyone about the alleged misconduct. [JA at 421-23].

Thus, in both her handwritten and typed statements executed on or shortly after March 4, 2012, Wilson expressly acknowledged that she had not reported the facts of Putman's alleged unlawful harassment to anyone other than non-supervisory co-workers. Not only did she admit that she deliberately decided not to inform her supervisors or Gaston County's Human Resource Office of what allegedly was going on, she wrote that she never shared text messages and pictures allegedly sent by Putman with any member of management.

Gaston County Human Resources immediately undertook an investigation, headed by Amia Massey. [JA at 75]. Massey interviewed Wilson, Putman, and several co-workers, including Phil Parker, Jessica Coe (now, Jessica Spurrier), Jason Spurrier, Adrienne Hill, and Travis Dellinger. [JA at 384-85]. Capt. McConnell and Travis Adams also were interviewed. [*Id.*]. Massey then prepared a memorandum regarding her findings. [JA at 386]. The allegations made by Wilson against Putman were substantiated. [JA at 389, 391]. Despite this finding in her favor, Wilson now complains about the investigation in her brief. [Doc. #15 at 17]. Specifically, Wilson takes issue with Massey not interviewing Tina Beheler. [Doc. #15 at 17]. Massey acknowledged that co-worker Tina Beheler was not interviewed. However, she testified that, given her finding that Wilson's allegations against Putman were substantiated, interviewing Beheler would have

11

been cumulative and would not have materially affected or altered the outcome of the investigation. [JA at 388-89].

As Gaston County Human Resource Director Pam Overcash testified, there is no automatic one-size-fits-all discipline for sexual harassment; each incident is assessed on a case-by-case basis. [JA at 74]. As a result of the investigation, Putman was suspended without pay, given a written warning, reassigned to a shift other than Wilson's shift, and required to attend EAP counseling. [JA at 395]. Notably, even Wilson admitted in her deposition testimony that she believes the discipline Putman received was adequate. [JA at 612].

In the section of Wilson's brief entitled "'Stage Two' Harassment," Wilson reverts back to her unsubstantiated allegations that the County changed her assignment so that she would be forced to interact with Putman. [Doc. #15 at 18]. Wilson conveniently fails to explain the way GEMS's shifts are structured. Every shift interacts at least briefly with every other shift at some point during shift change process. [JA at 363-64]. When Putman was transferred, some GEMS employees did not realize that Wilson, Putman, and their partners occasionally would have to switch trucks with each other during a shift change. [JA at 457]. Over a 4-5 month period, they ended up switching trucks approximately 11 times. [JA at 364]. Once this fact was discovered by Chief Lamphiear, he immediately ordered that it stop. [*Id.*]. HR was then notified. [JA at 366].

12

Regarding the alleged continued abuse, Wilson claims that Putman called her a derogatory term, threw keys, and bumped against her during one shift change. [Doc. #15 at 19]. However, Wilson's partner (Luke Shoulders), Putman, and his partner (Christin Lord) gave statements regarding their interactions during shift change and no one was able to substantiate Wilson's allegation of misconduct or inappropriate interaction between herself and Putman. [JA at 87-90]. Moreover, Wilson admitted in her deposition that Putman's harassing conduct toward her *stopped* after she finally complained about it on March 4, 2012, and that she was never alone with him or spoke to him after he was transferred to a different shift. [JA at 558-59, 610-11]. Nonetheless, the fact remains that GEMS took measures to ensure there was no interaction between them as soon as management learned of the occasional truck switch-outs. Even by Wilson's account, no further incidents occurred between her and Putman.

## II.    SUMMARY OF THE ARGUMENT

The District Court applied the correct standards of review and law. Despite Wilson's assertions now, the District Court did not improperly weigh evidence in favor of Gaston County and made no findings of fact regarding credibility. The District Court took the record before it and correctly found that Wilson had failed to present an issue of material fact to overcome Gaston County's Motion for Summary Judgment.

Wilson failed to produce sufficient evidence to overcome her own sworn deposition testimony and her statements that were given during the HR investigation. Further, Wilson failed to follow Gaston County's Sexual Harassment policy and failed to provide all material facts to her supervisors. The District Court applied the correct legal standard when assessing Wilson's claims; in fact, her claims still fail as a matter of law even using the legal standard that she now urges.

Lastly, Wilson failed to present a cognizable claim under the ADA or FMLA because she failed to present any material facts that she suffered any damages, was part of a protected class, or was subjected to any form of unlawful retaliation.

### III.    <u>ARGUMENT</u>

#### A.    **Standard of review**

In a summary judgment setting, the non-moving party is entitled to all *reasonable* inferences. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). However, allegations and denials are insufficient to establish a genuine issue of material fact, and "[o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Id.* at 248. "The mere existence of a scintilla of evidence in support of the Plaintiff's position [is] insufficient; there must be evidence on which the [fact finder] could reasonably find for the Plaintiff." *Id.* at 252. Therefore, a plaintiff must offer more than opinion, innuendo, and speculation to defeat summary

14

judgment. *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 57-58 (4th Cir. 1995). Moreover, once the moving party has met that burden, the nonmoving party has the burden of persuasion and must come forward with specific facts showing that there is a genuine issue for trial. *Schulze v. Meritor Automotive*, 163 F. Supp. 2d 559, 608 (W.D.N.C. 2000).

## B.    Wilson cannot prove her hostile work environment claim

Wilson asserts that Gaston County subjected her to a hostile work environment based upon her sex in violation of Title VII. [Doc. #15 at 21-2]. Her premise is that Gaston County failed to stop, and actually encouraged, Putman's alleged harassment. In her brief, Wilson complains without basis that the District Court misapplied precedent and misconstrued facts. [Doc. #15 at 22].

### 1.    Wilson cannot show a prima facie case of sexual harassment against Gaston County under any standard

To establish a *prima facie* case for a hostile work environment claim, Plaintiff must prove that she was exposed to conduct that was: (1) unwelcome; (2) based on her gender; (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment; and (4) imputable to Gaston County. *See Singleton v. Dep't of Corr. Educ.*, 115 Fed. App'x 119, 122 (4th Cir. 2004). In a case where, as here, an employee alleges she was sexually harassed by a coworker, the employer may be liable only

15

if it knew or should have known about the harassment and failed to take effective action to stop it. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998).

   Wilson complains that the District Court granted summary judgment on the last element alone; ignoring the fact she needed to make prime facie showing of *all necessary elements*. She continues by stating the District Court applied the supervisor standard instead of the co-worker standard while mainly relying on *Barret v. Applied Radiant Energy Corp.*, 240 F.3d 262 (4th Cir. 2001). [Doc. #15 at 26].

   In order to reach this conclusion, however, Wilson ignores the actual Order entered by the District Court. [JA at 99-118]. The District Court properly stated the standard that governs employer liability when a non-supervisory co-worker engages in sex based harassment, i.e., that the employer knew or should have known and failed to take action to stop it. *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 333-34 (4th Cir. 2003). Further, an employer may be held liable if it fails to provide reasonable procedures for victims to register complaints. *Id.*

   The gist of Wilson's present argument is that she informed supervisors of Putman's actions and/or they personally witnessed Putman's actions toward her but did nothing to stop it. [Doc. #15 at 25]. In order to accept this version of Wilson's story, however, the Court must completely ignore her previous statements, which she herself testified under oath were completely accurate and

16

truthful [JA at 531-32]: "I see now that I should have reported everything but I thought I was doing what was best for my career, GEMS, our shift, and Jim's family. … I now regret keeping quiet and wished that I would have come forward on that first day." [SJA at 8]. Moreover, Wilson admits that she went to Capt. Mitchell, but did not really go in to any detail about what Putman was allegedly doing. [SJA at 4-5]. According to her own deposition testimony, she failed to describe Putman's conduct as sexual harassment and simply informed Travis Adams that Putman was becoming "aggravating."[6] [JA at 525, 126].

Moreover, it is undisputed that Gaston County circulated a sexual harassment policy that provided a mechanism for filing a complaint. [JA at 253-70]. It is also undisputed that Wilson failed to take such action until March 2012, and only then because her supervisors ordered her to do so. [SJA at 1-8]. As the District Court noted, the distribution of an anti-harassment policy provides "compelling proof" that the employer exercised reasonable care in preventing and correcting harassment. *Barrett*, 240 F.3d at 266.

Here, Wilson requested not to be partnered with Putman and that request was granted. Further, Wilson alleges she only provided vague details about

---

[6] It is of note that Travis Adams was not in a supervisory role vis-à-vis Wilson except on those few occasions when he acted as a relief supervisor, as evidenced by the fact that he lacked authority to take supervisory action, such as hiring, firing, and the like. [JA at 459]. *See*, *Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013).

Putman's conduct to supervisors. As discussed, *supra*, Wilson admits in two written statements, affirmed under oath, that she deliberately kept Putman's alleged misconduct a secret from everyone other than non-supervisory co-workers until March 4, 2012, and there is no evidence that any of those co-workers notified management about what allegedly was happening to Wilson. On that basis, Gaston County could not have taken action to stop what it did not know was occurring. Notably, as soon as Gaston County became aware of the allegations on March 4, 2012, it took immediate action to end the harassment, and Wilson testified that the harassment did not occur after that.

### 2.     The District Court correctly applied the law

Wilson's complaint that the District Court applied the wrong precedent does not withstand scrutiny. [Doc. #15 at 26]. In making her argument, Wilson relies heavily on *Freeman v. Dal-Tile Corp.*, 750 F.3d 413 (4th Cir. 2014), for the proposition that summary judgment should not have been granted. [Doc. #15 at 24]. Even a cursory reading of *Freeman* shows two discernible and significant differences from the present case, however. In *Freeman* the plaintiff testified to informing a supervisor, which appears uncontradicted, about the *exact conduct* of the harasser and receiving an acknowledgement of the complaint. Despite that complaint and acknowledgement, the employer took no action to end the harassment. *Freeman*, 70 F.3d at 417-18. In this case, however, Wilson's own

sworn statements highlight that she deliberately failed to inform any supervisor about Putman's alleged unlawful conduct until ordered to do so on March 4, 2012. [SJA at 1-11]. Further, upon learning of the conduct Gaston County took immediate and, according to Wilson's testimony, effective steps to end it. Those differences make this case a far cry from *Freeman*.

The District Court found that Wilson gave differing accounts about her reporting of Putman's actions and that Gaston County had a proper mechanism for her to report Putman's actions, of which she refused to avail herself. [JA at 99, 108]. Wilson actually presents no evidence that the District Court used the wrong standard; instead, she merely notes her disagreement with the District Court's sound ruling.

It appears that Wilson's present argument is that her deposition testimony creates a material question of fact as to whether she informed Gaston County of Putman's alleged harassment; thus, making summary judgment improper. [Doc. #15 at 25]. Even taking Wilson's various versions in the light most favorable to her, she has, at best, offered conflicting versions of the facts, which cannot create a material issue as to whether Gaston County was put on notice of all material facts and circumstances germane to the alleged acts of Putman. *See, e.g., Halperin v. Abacus Technology Corp.*, 128 F.3d 191, 198 (4th Cir.1997); *Strickland v. Jewell*, 562 F. Supp. 2d 661, 671 (M.D.N.C. 2007).

### 3.     Gaston County was not on notice regarding Putman's alleged propensity to engage in sexual harassment

Wilson unconvincingly argues that Gaston County had knowledge of Putman engaging in similar conduct prior to the incidents involving her. [Doc. #15 at 27-8]. As her supposed "evidence," Wilson cites to an alleged incident with an unnamed female and another involving Jessica Spurrier. [Doc. #15 at 27-8]. However, none of the cited material supports Wilson's claims regarding the unnamed female. In fact, there are no allegations contained in any of Wilson's citations that are remotely similar to the allegations Wilson makes regarding Putman's alleged conduct toward her.

Wilson then attempts to rely upon the Putman-Spurrier incident as evidence that Gaston County knew of Putman's alleged proclivities. As discussed earlier, Jessica Spurrier's experience with Putman and Wilson's were very different. Jessica Spurrier described her episode as a one-time incident that "was more annoying than anything else." [JA at 91]. In fact, she testified that she was not aware of any conduct by Putman toward any "female that I considered improper enough that it should be reported to anyone." [*Id.*]. Wilson also claims that no corrective action was taken, although Jessica Spurrier testified that she requested not to be partnered with Putman again, and that request was granted. [JA at 92]. There is no evidence that such action did not correct whatever issue may have existed between Putman and Ms. Spurrier.

20

## C.    The District Court fully considered the record and evidence

Wilson claims the District Court made credibility determinations, ignored evidence, and construed factual disputes in Gaston County's favor. [Doc. #15 at 29]. Specifically, she alleges that the District Court did not consider the "Stage Two" harassment and that it ignored Wilson's signed declaration.

First, the suggestion that the District Court did not consider any allegations regarding conduct after March 4, 2012, is plainly contradicted by the District Court's Order. [JA at 104-05] (describing Wilson's allegations after Putman's shift change). It is apparent the District Court took this evidence in a light most favorable to Wilson, as it discounted certain evidence that directly contradicted Wilson's testimony. [JA at 87-90]. Moreover, Wilson admitted in her deposition that Putman's harassing conduct toward her stopped after she complained about it on March 4, 2012, and that she was never alone with him or spoke to him after he was transferred to a different shift. [JA at 558-59, 610-11]. As the District Court noted, once Gaston County became aware that Wilson, Putman, and their partners would occasionally swap trucks during shift changes, it took measures to ensure they would no longer trade off the same vehicle. [JA at 289-90].

Next, there is no indication that the District Court did not review Wilson's signed declaration, dated April 15, 2015, which simply gives her own opinions in an effort to deflect Gaston County's motion for summary judgment. [JA at 122-

23]. Wilson's contention is that because the District Court did not specifically cite to her declaration, reversible error was committed. Apart from Wilson disagreeing with her own deposition testimony and Gaston County's use of it against her in its motion for summary judgment [Doc. #15 at 31], Wilson simply repeats the same information the Court relied upon in its Order. Still, she complains that the District Court relied upon another Declaration helpful to Gaston County.[7] [Doc. #15 at 32]. Nowhere in the Order does the District Court expressly or inherently make any credibility determination regarding Wilson's declaration.

Wilson then provides a list of items as to which she believes the District Court made erroneous findings as a matter of law. [Doc. #15 at 32-3]. The list begins with the District Court's finding that GEMS promoted a reasonable harassment policy. Although Wilson now complains about this finding, she offered no evidence on which the District Court could have relied to the contrary. Next, she disagrees with the finding that she did not avail herself of the sexual harassment policy until March 4, 2012. Again, Wilson's own written statements and deposition testimony betray her position. [JA at 531-32, 534-35; SJA at 1-11]. Inexplicably, Wilson also now disagrees with the finding that Gaston County HR

---

[7] The Declaration of which Wilson complains was made by Jessica Spurrier and describes her dealings with Putman and GEMS management. Its contents are uncontested. [JA at 91-2].

conducted an investigation and substantiated her claims, even though it is uncontested that is what happened. [JA at 85-6].

Wilson further takes issue with the District Court's finding that Gaston County acted reasonably when it took corrective action against Putman. The evidence shows that Putman was transferred to a different shift – which Wilson testified was a proper resolution of the matter – and once it was discovered that Wilson and Putman would occasionally swap vehicles during to shift change, that situation was immediately corrected, as well. [JA at 289-90]. As was already noted several times, *supra*, Wilson testified that she was not harassed by Putman after March 4, 2012. For her now to suggest that Gaston County's actions in ending the alleged harassment were unreasonable is at least disingenuous, given her testimony that it was sufficient and achieved an end to the harassment. Moreover, it simply sounds as though she is now arguing that Gaston County should be held liable for not punishing Putman "enough." As the District Court found, Gaston County's actions achieved an end of the alleged harassment. That is what Supreme Court precedent requires. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998). That Wilson now suggests otherwise is unavailing. The District Court followed longstanding precedent.

Wilson's reliance on *Jacobs v. N.C. Admin Office of the Courts*, 780 F.3d 562 (4th Cir. 2015), is misplaced. In *Jacobs*, it was noted that the District Court

23

actually considered the evidence in a light most favorable to the moving party. *Id.* at 569. In addition, the District Court in *Jacobs* completely ignored the non-moving party's competent evidence. *Id.* at 569-70. Here, a reading of the Order clearly shows that all competent evidence was taken in a light most favorable to Wilson. [JA at 99-118]. The District Court evaluated the competent evidence before it and found that the evidence and Wilson's own statements showed that Gaston County acted reasonably.

**D.    Gaston County did not retaliate against Wilson**

Wilson advances a theory that she was disabled and treated differently than non-disabled employees and that she was subjected to retaliation by being held to a high standard than other employees. [Doc. #15 at 35-6]. Wilson also asserts, without support from the record, that Gaston County retaliated against her for seeking leave under the FMLA by allowing Putman to harass her. [Doc. #15 at 36]. The record does not support Wilson's allegations.

First, it appears that Wilson has abandoned her claim that Gaston County violated the FMLA when it terminated her and that she was improperly passed over for a promotion. [Doc. #15 at 36]. This is likely because 29 U.S.C. § 2716(a)(1)(A)(i)(I) only provides for "damages equal to any wages, salary, employment benefits, or other compensation denied or lost to such employee by

reason of the violation."[8] Instead, Wilson appears to only maintain a retaliation claim regarding write-ups and harassment. [Doc. #15 at 36].

As Wilson properly stated in her brief, she bears the burden of making a *prima facie* showing "that [s]he engaged in protected activity, that [Gaston County] took adverse action against [her], and that the adverse action was causally connected to [her] protected activity." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998). If she makes that *prima facie* showing, then Gaston County bears the burden of offering a nondiscriminatory explanation for its decision to terminate Wilson's employment, and, thereafter, the burden of proof would fall to Wilson to show that Gaston County's proffered explanation is pretext for FMLA retaliation. *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001.

Similarly, disability discrimination claims under the ADA are evaluated under the *McDonnell/Douglas* "pretext" framework. *See Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio*, 53 F.3d 55, 57-58 (4th Cir. 1995). To establish a *prima facie* case of retaliation under the ADA, Wilson must show that: (1) she engaged in protected conduct; (2) she suffered an adverse action subsequent to engaging in the protected conduct; and (3)

---

[8] As was noted earlier, Wilson admitted in her deposition that she was reinstated just six days after being discharged, was made whole for all wages and benefits, and suffered no financial loss as a result of her termination.

there was a "but-for" causal link between the protected activity and the adverse action. *See Gentry v. East West Partners Club Management Company, Inc.*, ___ F.3d ___, (No. 14-2382) (4th Cir. 2016); *see also Laber*, 438 F.3d at 432.

What makes Wilson's argument border on being preposterous is that she admittedly never requested FMLA leave and testified that she does not consider herself disabled. [JA at 509, 536, 572-73]. Further, the record contains no evidence that anyone employed by Gaston County believed Wilson was disabled. [JA at 515].

Wilson repeats the same refrain that the District Court and the record show to be erroneous; namely, she was held to a different standard than other employees. [Doc. #15 at 36]. The record is clear that Wilson was not written up any more than many other employees. [JA at 129]. As the District Court noted, Wilson requested time off in September 2010 and did not receive another written warning until August 2011. [JA at 34-5]. Importantly, Wilson does not contest that these write-ups were legitimate. [JA at 519]. As this Court has held, "dislike of or disagreement with an employer's decisions does not invariably make those decisions ones that adversely affected some aspect of employment." *Adams v. Anne Arundel County Public Schools*, 789 F. 3d 422, 431 (4th Cir. 2015). Wilson's write-ups constitute reprimands and poor performance evaluations, which "occur with some frequency in the workplace" among many employees. *Id.*

In keeping with her theme of distorting the facts by presenting only part of the record, Wilson claims Chief Lamphiear instructed management to specifically target her. [Doc. #15 at 36]. Yet, the testimony clearly shows this assertion to be untrue. [JA at 64, 377, 379, 404-05, 409, 467-71]. There is no evidence in the record that any member of management directed that Wilson, specifically, be targeted for anything. Contrary to the innuendo in Wilson's brief, the record contains no competent evidence of any unlawful retaliation.

Perhaps the most striking claim now urged by Wilson is that Gaston County was in cahoots with Putman or at least allowed Putman to harass her as part of its alleged retaliation against her. [Doc. #15 at 36]. Of course, Wilson offers nothing more than innuendo in support of this contention and makes no citation to the record. As previously discussed, *supra*, Wilson's own admission is that she did not inform any supervisor about Putman's conduct until March 4, 2012. [SJA 1-11]. By any reasonable measure, Wilson cannot meet her burden of presenting a *prima facie* case of retaliation.

**E.    The District Court properly granted summary judgment regarding Wilson's state law tort claims**

Wilson's state law tort claims fare no better than her federal law claims, and her appeal is premised on her disagreement with the District Court's findings and her continuing refrain that the District Court misapplied the summary judgment standard. [Doc. #15 at 37].

### 1.      Gaston County did not negligently retain or supervise Putman

In order to prove a claim for negligent supervision and retention against Gaston County, Wilson is required to prove that Putman was an incompetent employee who committed a tortious act, stemming from his incompetence, that resulted in injury to her, and that Gaston County previously knew or had reason to know of Putman's incompetence. *Jackson v. FKI Logistex*, 608 F. Supp. 2d 705, 707 (E.D.N.C., 2009); *Graham v. Hardee's Food Sys., Inc.*, 121 N.C. App. 382, 385, 465 S.E.2d 558, 560 (1996). It is an essential element of the claim "that an employee of the employer 'committed a tortious act resulting in [P]laintiff's injuries.'" *Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 774 (4th Cir. 1997) (*quoting Waddle v. Sparks*, 331 N.C. 73, 414 S.E.2d 22, 29 (1992)). The Fourth Circuit has held that North Carolina law requires that the commission of a common-law tort underlie a negligent retention and supervision claim. *McLean v. Patten Communities, Inc.*, 332 F.3d 714, 719 (4th Cir. 2003).

Wilson supports her contention that summary judgment was improper by referencing what she terms "Stage One" and "Stage Two" harassment by Putman. [Doc. #15 at 38]. Wilson speculates that a jury could conclude that Putman had sexually harassed multiple employees previously and that Gaston County knew about the ongoing harassment. [Doc. #15 at 38]. Wilson's contention obviously

does not meet the prior notice requirement. *Graham*, 121 N.C. App. at 385, 465 S.E.2d at 560.

Wilson further argues the District Court improperly construed Jessica Spurrier's report. [Doc. #15 at 38-9]. It is accurate that Spurrier reported this one-time incident, but Wilson once again mischaracterizes the actual testimony regarding her report. [Doc. #15 at 39]. Spurrier informed her supervisor that she did not want to be partnered with Putman because he got in her personal space and tickled her. [JA at 146]. Spurrier never testified that she informed her supervisors that Putman attempted to kiss her. [JA at 147]. Moreover, Spurrier described the incident as "more annoying than anything else." [JA at 91]. Spurrier then made a request not to be partnered with Putman, and that request was granted. [JA at 92]. As the District Court correctly observed in its Order, this was a one-time, isolated incident that differed significantly from Wilson's allegations, and Ms. Spurrier's requested resolution of it was granted. [JA at 111].

Wilson argues the District Court discredited evidence that she informed her supervisors of the harassment and that her supervisors actually witnessed it on multiple occasions, thereby putting Gaston County on notice. [Doc. #15 at 39]. As previously discussed, however, Wilson admitted that she deliberately chose not to tell management or HR about Putman's alleged misconduct. [*Supra*]. Likewise, she cites only to her own deposition as supposed "proof" of what she believes Capt.

McConnell or Travis Adams may have seen. There is no evidence in the record to support Wilson's contention that any supervisor personally witnessed Putman do anything improper toward Wilson.

Wilson's argument that the District Court considered the evidence in a light most favorable to Gaston County is not supported by the actual Order. Wilson simply rehashes the same arguments that she made for her Title VII claim, which are unavailing. The record is clear that once Gaston County became aware of Putman's alleged conduct, it took immediate and effective actions to cease any unlawful harassment, whether occurring in "Stage One" or "Stage Two". [*Supra*].

### 2. Wilson failed to provide all material facts to Gaston County regarding the alleged battery by Putman

Wilson sought to hold Gaston County liable under a theory of *respondeat superior* regarding the alleged battery of Wilson by Putman. Wilson argues that Gaston County "knew exactly what Putman was doing." [Doc. #15 at 42].

In North Carolina, a plaintiff establishes a claim for battery by showing (1) intentional infliction of offensive contact upon her person, (2) without her consent. *Dickens v. Puryear*, 302 N.C. 437, 276 S. E.2d 325 (1981). Where an employee has committed a battery, the employer may be held liable for the employee's behavior only if the plaintiff is able to show that the employer specifically authorized the behavior, that the behavior was within the course and scope of employment and in furtherance of the employer's business, or that the employer

ratified the behavior after it occurred. *Brown v. Burlington Indus., Inc.*, 93 N.C. App. 431, 436, 378 S.E.2d 232, 235 (1989) (quoting *Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 340 S.E.2d 116, *disc. rev. denied*, 317 N.C. 334, 346 S.E.2d 140 (1986)).

Important to the present matter is that ratification may be established by a showing that "the employer had knowledge of *all material facts and circumstances* to the wrongful act, and that the employer, by words or conduct, shows an intention to ratify the act." *Id.* at 437, 236 (emphasis added). Ratification may also be shown by an employer's omission to act to rectify a problem brought to the attention of the employer by an employee. *Id.*

Wilson argues that, taking the evidence in a light most favorable to her, she informed supervisors about Putman's unwanted touching. However, as the District Court noted, the record does not support her argument. [JA at 108-09]. Her own statements, affirmed under oath, plainly say that she intentionally did not make any such report. Even putting those statements aside, Wilson failed to follow the sexual harassment policy, failed to report Putman's conduct as sexual harassment, and failed to give any meaningful detail about any incident. [JA at 525]. Wilson did request not to be placed on a truck with Putman, and that request was granted. [JA at 525; SJA at 4-5].

Wilson then argues that Gaston County put Wilson "in Putman's path" after he was suspended and transferred. [Doc. #15 at 42]. Ignoring Wilson's penchant for dramatic prose, the District Court considered the evidence in a light most favorable to her and only relied on her account of the "Stage Two" harassment, never mentioning that none of Wilson's co-workers would corroborate her account. [JA at 87-90]. As stated above, ratification can be shown by an employer's failure to rectify a known problem. Here, Gaston County transferred Putman immediately after March 4, 2012. When it later discovered that Putman and Wilson would occasionally have to swap trucks during shift change, it took immediate measures to ensure it did not occur again. Wilson's own testimony is that Putman's harassing conduct ceased after March 4, 2012, and that she was never alone with him or spoke to him again. [JA at 558-59, 610-11]. Wilson is simply attempting to create a question of material fact by asking the Court to choose between two conflicting versions of her own story. Such a request is improper and will not help avoid summary judgment. *Halperin*, 128 F.3d at 198.

### 3.    Wilson failed to make a prima facie showing for IIED

To state a claim for intentional infliction of emotional distress ("IIED") a plaintiff must show: (1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress of another. *See Thomas v. Northern Telecom, Inc.*, 157 F. Supp. 2d 627, 634-35 (M.D.N.C. 2000); *Dickens v.*

*Puryear*, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981); and *Simmons v. Chemol Corp.*, 137 N.C. App. 319, 325, 528 S.E.2d 368, 371 (2000).

North Carolina law establishes a stringent standard that permits liability to be imposed only where the conduct at issue is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hogan v. Forsyth Country Club*, 79 N.C. App. 483, 493-94, 340 S.E.2d 116, 123 (1986). Whether the conduct alleged meets this stringent standard is a question of law for the court, not a question of fact for the jury. *Id.* 79 N.C. App. at 490, 340 S.E.2d at 121. Furthermore, "in employment actions, North Carolina courts have been reluctant to find intentional infliction of emotional distress claims actionable." *Frazier v. First Union Nat. Bank*, 747 F. Supp. 1540, 1553 (W.D.N.C. 1990). Indeed, "[I]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to support a claim of intentional infliction of emotional distress. *Thomas v. N. Telecom, Inc.*, 157 F. Supp. 2d 627, 635 (M.D.N.C. 2000) (citing *Atkins v. USF Dugan, Inc.*, 106 F. Supp. 2d 799 (M.D.N.C. 1999); *Wilson v. Southern Nat'l Bank*, 900 F. Supp. 803, 811-12 (W.D.N.C. 1995)). There is an "extremely rigorous standard" for an intentional infliction of emotional distress claim in the employment context. *Id.* Liability, in an employment context, "clearly does not extend to [] insults, indignities, threats, ...."

*Wagoner v. Elkin City Schs' Bd. of Educ.*, 113 N.C. App. 579, 586, 440 S.E.2d 119, 123 (1994).

In cases where North Carolina courts have found intentional infliction of emotional distress, the conduct has been extremely egregious, far beyond the factual allegations in this case. For example, in *Hogan*, the single successful plaintiff alleged that in addition to using profanity and threatening her, the defendant's agent made sexually suggestive remarks, coaxed her to have sex with him, subjected her to non-consensual sexual touching, threatened her with bodily injury, and ultimately threatened her with a knife. 79 N.C. App. at 490, 340 S.E.2d at 121. Nothing remotely analogous to that kind of extreme conduct or agency relationship is supported by the record in this case.

Applying these legal principles to this case, Wilson clearly has failed to state a claim for intentional infliction of emotional distress. As the District Court held, Wilson's IIED claim rests on the same premise as her battery claim.

Wilson attempts to attribute the alleged conduct of Putman equally to Gaston County. She further argues that the District Court omitted record evidence and resolved factual disputes. [Doc. #15 at 44]. Nonetheless, Wilson has failed to point to actual conduct *by Gaston County* that reasonably could be regarded as atrocious and utterly intolerable in a civilized community. As was already discussed *ad nauseum*, Wilson admits in two written statements, which were affirmed under

oath in her deposition, that she did not tell anyone about Putman's alleged misconduct other than non-supervisory co-workers. When she did approach Capt. Mitchell on February 28, 2012, she admittedly "did not go into much detail." Then, when she was finally forthcoming just four days later, on March 4, Gaston County took immediate and, according to Wilson's testimony, effective corrective action against Putman.

The District Court acted properly in granting summary judgment on Wilson's IIED claim.

## IV.    CONCLUSION

Based on the evidence in the record, and for the foregoing reasons, Gaston County respectfully submits that this Court should affirm the District Court's grant of summary judgment.

Respectfully submitted,

**GASTON COUNTY**

By:  **/s/Paul H. Derrick**
Paul H. Derrick
NC STATE BAR # 27366
FREEMAN MATHIS & GARY, LLP
5540 Centerview Drive, Suite 200
Raleigh, North Carolina 27606
Telephone: (919) 424-3850
Fax: (919) 786-9662
E-mail:  pderrick@fmglaw.com

*Counsel for Appellee*

**/s/Martha Raymond Thompson**
Martha Raymond Thompson
NC STATE BAR # 16020
STOTT, HOLLOWELL, PALMER
 & WINDHAM, L.L.P.
401 East Franklin Blvd, P.O. Box 995
Gastonia, North Carolina 28053-0995
Telephone:  (704) 864-3425
Fax: (704) 864-0478
E-mail:  mthompson@shpw.com

*Counsel for Appellee*

## V.  <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains <u>8,342</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

Dated: April 11, 2016          /s/Paul H. Derrick_____
                               Paul H. Derrick

                               *Counsel for Appellee*

## VI.    <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on April 11, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all the following registered CM/ECF users.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES, LLC
P.O. Box 1460
Richmond, VA  23218
